[Cite as *In re B.S.*, 2019-Ohio-758.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN THE MATTER OF:

B.S.

:

:

:

:

:

CASE NO. CA2018-11-129

O P I N I O N
3/4/2019

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE COURT
Case No. 17-D000111

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

Alexander, Wagner & Kinman, Maxwell D. Kinman, 423 Reading Road, Mason, Ohio 45040, for appellant

**HENDRICKSON, P.J.**

{¶ 1}  Appellant, the mother of B.S. ("Mother"), appeals from the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of her son to appellee, the Warren County Children Services ("WCCS").  For the reasons outlined below, we affirm the juvenile court's permanent custody determination.

**Facts and Procedural History**

{¶ 2}  B.S. was born on July 30, 2017.  Three days later, on August 2, 2017, WCCS

filed a complaint alleging B.S. was a neglected, abused, and dependent child. In support of its complaint, WCCS alleged it had received a report that B.S. tested positive for amphetamines at birth. The complaint indicates Mother also tested positive for amphetamines at the time she gave birth to B.S. When confronted with these test results, Mother admitted to using methamphetamines the day before giving birth to B.S. and also admitted to using methamphetamines on at least two occasions during her pregnancy with B.S.

{¶ 3} The complaint further alleges that B.S.'s father ("Father") had recently been released from the Warren County Jail.[1] The record indicates Father was serving a jail sentence after he was convicted of domestic violence against Mother. It is undisputed that Father has an extensive criminal history and has spent significant time in prison. It is also undisputed that Mother's two older children were removed from her care due to Mother's prior illegal drug use and Father's domestic violence against her. The record indicates Mother's two older children were ultimately placed in the legal custody of a relative (their paternal great-uncle) approximately one year after their removal.

{¶ 4} After receiving WCCS's complaint, the juvenile court granted WCCS's motion for emergency temporary custody of B.S. The juvenile court then appointed B.S. with a Court Appointed Special Advocate ("CASA"). B.S. was subsequently removed from Mother's care and placed in a licensed foster to adopt home. It is undisputed that since being removed from Mother's care B.S. has remained in the same licensed foster to adopt home with the same foster family. The record indicates B.S., who is still just one year old, is now thriving in his foster home and has bonded with his foster family. This includes B.S. being developmentally on track for a child his age. The record also indicates B.S.'s foster

---

1. Father is not a party to this appeal and has not been involved in any aspects of this case or in B.S.'s life since his birth.

family is interested in adopting B.S.

## Adjudication, Disposition, and Motion for Permanent Custody

{¶ 5} On October 11, 2017, the juvenile court adjudicated B.S. a dependent child. Two weeks later, the juvenile court issued a dispositional decision granting temporary custody of B.S. to WCCS. Shortly thereafter, the juvenile court amended its prior adjudication to include a finding that B.S. was also abused. A case plan was then established that required Mother to cooperate and make herself generally available to WCCS at least once a month. Mother was also required to submit to random drug screens and complete drug, alcohol, and mental health assessments to address her significant substance abuse and untreated mental health issues. Mother was further ordered to complete parenting classes, to remain clean and sober throughout the pendency of the case, and to obtain and maintain safe and stable housing, employment, and a steady source of verifiable income.

{¶ 6} On July 23, 2018, WCCS moved for permanent custody of B.S. In support of its motion, WCCS reiterated the same general allegations contained in its complaint filed on August 2, 2017. WCCS also alleged, in pertinent part, the following:

> Mother did not initially engage in case plan services. She was admitted into in-patient treatment in October 2017. At the completion of her in-patient program she was recommended to begin transitional services in December 2017; Mother did not engage in out-patient services and failed to maintain contact with WCCS from December 2017 through April 2018. Mother attended a review hearing at the end of April 2018 at which time she expressed a desire to re-engage in services. Mother continues to test positive for methamphetamine. Her last positive drug screen was on July 2, 2018. Mother is not engaged in drug and alcohol treatment at this time. Mother did not visit with [B.S.] from October 2017 through May 2018.

## Permanent Custody Hearing

{¶ 7} On October 8, 2018, the juvenile court held a hearing on WCCS's motion for

permanent custody. During this hearing, the juvenile court heard testimony from two witnesses: Mother and the ongoing caseworker assigned to the case. The following is a summary of the testimony and evidence presented at the permanent custody hearing.

### Caseworker's Testimony

{¶ 8} The caseworker testified that since B.S. was removed from Mother's care and placed in a licensed foster to adopt home the child was developmentally on target and "very much" bonded to his foster family. The caseworker also testified that the foster family has expressed a willingness to adopt B.S. if permanent custody was granted to WCCS.

{¶ 9} As it relates to Mother, the caseworker testified she had very limited contact with Mother. For instance, as the caseworker testified, after Mother was released from an inpatient treatment facility in December of 2017, Mother told WCCS she was "going to Georgia to visit some family for Christmas[.]" Although described as merely a weekend trip, Mother did not return to Ohio until several weeks later. Yet, despite being back in Ohio, it is undisputed that Mother did not reestablish contact with WCCS until April 26, 2018. This renewed contact between WCCS and Mother occurred after Mother unexpectedly appeared at the 180-day review hearing before a juvenile court magistrate.

{¶ 10} Upon making contact with Mother, the caseworker testified Mother informed her that she wanted to resume her case plan services. This, as the caseworker testified, included Mother's apparent willingness to seek treatment for her still pervasive and significant substance abuse and untreated mental health issues. Thereafter, upon yet another positive drug screen, WCCS referred Mother for an updated drug, alcohol, and mental health assessment. Following this assessment, a recommendation was made for Mother to attend an intensive outpatient program. The program provided both group and individual counseling to Mother in order to address Mother's substance abuse and mental health issues.

{¶ 11} The caseworker testified that Mother did not regularly attend either the group or individual counseling sessions. Rather, as the caseworker testified, Mother attended on average only one counseling session per month. When asked if Mother's sporadic attendance at the counseling sessions was due to Mother's own choosing, the caseworker testified, "[B]y her choice. She either no-calls/no-shows or, um, makes excuses to them about why she's not going." The caseworker also testified that Mother told her she felt there were "too many classes" and that she was "overwhelmed."

{¶ 12} The caseworker further testified regarding one of the several monthly reports she received from the treatment facility outlining Mother's progress. Reading the report into the record, the caseworker testified:

> [Mother] has attended one out of four scheduled appointments since the last report. Client called on both dates she didn't attend session. The first time she reported she had just gotten out of court and was going to find a new lawyer and the second time she reported she forgot and had orientation for a job. Client reported struggling with her drug use at the 8/27 appointment but was looking to find the motivation to stay sober. [Mother] reported she had not been coping well.

{¶ 13} The caseworker also testified that Mother admitted to using illegal drugs "typically every time we talk about it." This includes Mother testing positive for a "pretty high level" of amphetamines and methamphetamines during her weekly supervised visitation time with B.S. on August 9, 2018. This, as the record indicates, was approximately two months prior to the hearing on WCCS's motion for permanent custody. The caseworker further testified that Mother attended at least two of her weekly supervised visits with B.S. while under the influence of methamphetamines. But, although actively using methamphetamines prior to her supervised visitation time, the caseworker nevertheless testified that "[y]ou won't notice it in her parenting, though. And that's why we have not ended the visitations. She has a very high tolerance."

{¶ 14} Concluding, when asked to summarize her concerns regarding Mother and her ability to properly care for B.S., the caseworker testified that "[n]othing has changed in the last year since we removed [B.S.]." Most concerning to the caseworker, as well as to this court, was the caseworker's testimony that Mother was still "actively using drugs." This is true despite the fact that, as the caseworker testified, Mother appeared to be a "very good, natural parent" during her weekly supervised visitation time with B.S.

Mother's Testimony

{¶ 15} Mother testified and readily admitted that she had used methamphetamines during her pregnancy with B.S. up to and including the day before giving birth to B.S. Mother also acknowledged that she had not completed the required case plan services offered by WCCS. This includes the requirement that she complete drug, alcohol, and mental health assessments and any recommended treatment to address her significant substance abuse and untreated mental health issues. Mother, however, blamed this failure on WCCS not calling, texting, or contacting her for over a month after she "showed up at the agency trying to get in contact with someone." But, when asked if she ever responded to the caseworker when the caseworker contacted Mother and asked if she would be willing to meet after-hours or on the weekend, Mother testified "I did not reply back, no."

{¶ 16} Mother testified that she had just obtained a house that she planned to refurbish to accommodate her and B.S. Mother, however, had had yet to move in to the home. Rather, as Mother testified, "I have been, uh, inside, you know, moving things out and painting and trying to get the interior livable." But, until that home was available for her to move in, Mother testified that she had been residing with a friend who charged her $50 per week in rent. This, as Mother testified, allowed her to "just have a room in the basement."

{¶ 17} Mother testified that she had not worked in either 2016 or 2017 but that she

had worked at three different jobs in 2018. The record indicates that one of those jobs was at a local fast food restaurant. However, when asked to describe her employment at that restaurant, Mother testified:

> I showed up there for my training, the manager said, I'm already short-staffed, I don't know what I'm supposed to do with you, go have a seat out there. So I went out in the lobby and waited for an hour. Um, I went back up to see what was going on and it was such a miscommunication with scheduling. I just went ahead and left.

After leaving the restaurant, Mother testified she then called the district manager but was turned off by the "attitude of the managers" so she decided "it was not a very good fit for me with, you know, the, um, atmosphere and the way they were."

{¶ 18} Mother testified she had also worked at a mobile car detailing business. However, after the seasons changed, Mother testified her hours decreased to the point where she needed to seek other employment. To that end, Mother testified she had just recently been hired as housekeeper at a nearby hotel. Mother testified that this was a full-time position where she had worked for approximately three weeks. Mother, however, never provided any verification of her purported employment or income as required by her case plan.

{¶ 19} Mother testified and admitted that she had not had any contact with WCCS from December of 2017 until April 26, 2018. When asked why she had not contacted WCCS as mandated by her case plan, Mother testified that she had left the state and went to Georgia to visit her father over the Christmas holiday. However, upon returning to Ohio a few weeks later, she "got around the wrong group of friends" and relapsed. Specifically, as Mother testified:

> I admit, your Honor, that I did come back, I did relapse, I was ashamed, felt guilty, and I was so ashamed that, you know, I didn't call the agency. I was embarrassed. Um, in April I kind of picked myself up and faced it and showed up at the court

hearing to engage back in services.

{¶ 20} But, although Mother claims she "picked [herself] up and faced it," Mother nevertheless tested positive for methamphetamines in May, July, and August of 2018 when tested by WCCS. When asked if she would agree that she had not been able to demonstrate an ability to remain sober throughout the pendency of this case, Mother admitted that she had struggled with her addiction and substance abuse issues, but that she had now turned the corner and would be able to maintain her sobriety going forward.

{¶ 21} Specifically, as Mother testified:

> I will agree to, you know, the first part, but I feel not that I, you know, I can maintain sobriety because I have positive things looking forward to. And, you know, I've got that foundation built to help me maintain that sobriety.

{¶ 22} Continuing, Mother then testified:

> I personally know what it takes for me to stay clean and, you know, working and, you know, having something to do, to look forward to every day. You know, I got my home to look forward too, working. That's what keeps me clean.

{¶ 23} This testimony, however, was contradicted by Mother's subsequent testimony acknowledging that she had suffered multiple relapses in the years both prior to and after her two older children were removed from her care. This included a relapse within weeks of Mother being released from the inpatient treatment facility in December of 2017. This relapse, as Mother testified, resulted in her using amphetamines and methamphetamines for at least the next eight months up to and including the day prior to her weekly supervised visitation time with B.S. on August 9, 2018.

{¶ 24} Mother acknowledged that her two older children had been removed from her care due to her illegal drug use, which, at that time, was primarily heroin. Specifically, as Mother testified, "I was not clean at the time, so they could not be placed with me, so they were placed with the uncle." Further explaining her prior heroin use, Mother testified:

[WCCS's TRIAL COUNSEL]: Okay.  You indicated that you last used heroin in 2014; is that – is that what your testimony was?

[MOTHER]: I believe so.  I'm not exactly accurate.

[WCCS's TRIAL COUNSEL]: Okay.  Didn't you overdose on heroin in Dayton in 2016?

[MOTHER]: Ma'am, to be honest with you, the years are married together.  I honestly don't recall exact years.  Um, I know heroin has not been a problem for me presently.

{¶ 25} Accepting the nearly endless issues caused by her illegal drug use, Mother testified that she had "struggled with addiction a good part of my life.  Um, you know, being homeless and having to stay here and there has been a big part of my drug addiction and struggling."  But, although admitting to significant substance abuse and untreated mental health issues, Mother nevertheless testified that this time things would be different.  As Mother testified:

> I want to have my son in my life.  I have wanted that all along, but I just struggled with being homeless and all the other factors. I just couldn't find that – for it all to fit together and the pieces are finally fitting together in my life.  And I can admit, you know, that I have done wrong and I've struggled with addiction a big, big, big part of my adult lifehood [sic], and I've never felt as responsible as I can say I do today.

### Juvenile Court's Decision

{¶ 26} On October 16, 2018, the juvenile court issued a decision granting WCCS's motion for permanent custody.  In so holding, the juvenile court found that after taking into consideration the credibility of the testimony and the weight of that testimony, as well as the report and recommendation of the CASA, granting permanent custody to WCCS was in B.S.'s best interest.  The juvenile court reached this decision upon finding it was Mother's "inability to refrain from using illegal drugs that plagues her the most."  This was true despite the fact that, as the juvenile court found, Mother appeared to be a capable and loving parent during her weekly supervised visitation time with B.S.

**Appeal**

{¶ 27} Mother now appeals from the juvenile court's decision granting WCCS's motion for permanent custody. In support, Mother raises a single assignment of error arguing the juvenile court's decision finding it was in B.S.'s best interest to grant permanent custody to WCCS was not supported by sufficient evidence. Mother also argues the juvenile court's decision was against the manifest weight of the evidence. Under these circumstances, this court applies the following standard of review.

**Standard of Review**

{¶ 28} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 29} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable

inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases.  *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.  Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."  *Eastley* at ¶ 21.

### Two-Part Permanent Custody Test

{¶ 30} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test.  *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9.  First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D).  *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three

separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

### Abandonment

{¶ 31} As it relates to the second part of the two-part permanent custody test, the juvenile court found Mother had abandoned B.S. This is because, as determined by the juvenile court, Mother had at one point not had any contact with B.S. for a period of at least 90 days prior to the filing of the permanent custody motion. Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Mother does not dispute the juvenile court's finding she had abandoned B.S.

### Best Interest of the Child

{¶ 32} Turning now to the first part of the two-part permanent custody test, the juvenile court found it was in B.S.'s best interest to grant permanent custody to WCCS. As noted above, Mother disputes the juvenile court's best interest finding by arguing the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. We find no merit to Mother's claims.

{¶ 33} Initially, with respect to B.S.'s relevant interactions and relationships with those who may significantly impact his young life, the juvenile court found B.S. was thriving in his current foster home under the care of his foster family. The juvenile court also noted that B.S. was bonding with his foster family. The juvenile court further noted that granting WCCS's motion for permanent custody was the only chance that B.S. had for stability. This, as the juvenile court determined, would allow WCCS to arrange for B.S. to be adopted

"hopefully through his same foster family."

{¶ 34} Next, regarding B.S.'s wishes, the juvenile court relied on the CASA's report that recommended the juvenile court grant WCCS's motion for permanent custody. This recommendation was based on numerous factors. For instance, as the CASA stated in her report, "[Mother] has a long history of drug use and picking domestically violent men. She has tested positive for heroin and amphetamines in the past."

{¶ 35} The CASA also noted that she had trouble contacting Mother throughout the pendency of this case due to Mother having her phoneline disconnected on multiple occasions. But, even when the CASA was able to contact Mother, the CASA noted that Mother had hung up on her after she identified herself "then called back again and no voicemail available and no answer."

{¶ 36} The CASA further noted in her report regarding Mother's weekly supervised visitation time and Mother's ability to work her case plan:

> During her visit on May 31st, the case aide thought mom was acting a bit funny and got permission to screen her. It was reported that mom bit off the end of the screening tool. That drug test came back positive. Her last positive screen [as of the date of the report] was 7/2/2018 for methamphetamine. She has stated that she is overwhelmed with all the treatment appointments she has to do and working. She would like to go to treatment one day a week. This was not the recommendation from her treatment provider.

{¶ 37} Turning then to B.S.'s custodial history, the juvenile court found B.S. had been in the temporary custody of WCCS since the case was initiated on August 2, 2017. The record supports the juvenile court's finding.

{¶ 38} Furthermore, when considering B.S.'s need for a legally secure placement, the juvenile court found B.S.'s need for a legally secure permanent placement could not be achieved without a grant of permanent custody to WCCS. The juvenile court also found Mother was unable to meet B.S.'s needs and that Mother had failed to remedy the

- 13 -

conditions that resulted in B.S.'s removal from her care. This, as the juvenile court noted, was based primarily on Mother's unwillingness or inability to refrain from using illegal drugs prior to, during, and after giving birth to B.S. Therefore, according to the juvenile court, granting WCCS's motion for permanent custody was the best chance for B.S. to achieve the stable family home that he needs.

{¶ 39} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court reiterated its previous finding that Mother had abandoned B.S. by at one point not having any contact with B.S. for a period of at least 90 days prior to when WCCS filed its motion for permanent custody. Mother does not dispute this finding.

**Analysis**

{¶ 40} After a thorough review of the record, and as noted above, we find the record supports the juvenile court's decision to grant WCCS's motion for permanent custody. Mother nevertheless disputes the juvenile court's decision claiming the juvenile court failed to fully consider several of the best interest factors she claims weigh more heavily in her favor. Therefore, when considering the record in its entirety, Mother argues the juvenile court's decision to grant permanent custody to WCCS was premature and improper. We disagree.

{¶ 41} Mother initially claims the juvenile court's decision was improper when considering she was able to provide B.S. with a legally secure permanent placement. Mother appears to be referring to her testimony that she had recently obtained a house that she was refurbishing to accommodate her and B.S. Mother, however, had not yet moved into the house. Rather, as Mother testified, "I have been, uh, inside, you know, moving things out and painting and trying to get the interior livable."

{¶ 42} The record indicates Mother also never provided the home's address to WCCS. WCCS was therefore unable to determine if Mother had in fact obtained suitable

housing to accommodate her and B.S. Suitable housing was one of the many requirements set forth as part of Mother's case plan. Mother's then living situation – a room in the basement of her friend's home – was certainly not suitable for her to raise B.S. Therefore, under these circumstances, the juvenile court's decision finding Mother could not provide B.S. with a legally secure permanent placement was proper.

{¶ 43} Mother also claims the juvenile court's decision was improper because she had engaged in the required case plan services and exhibited a willingness to engage in more services if WCCS's motion for permanent custody was denied. The record does not support Mother's claim. Rather, as the juvenile court found:

> As far as [WCCS] is concerned, Mother has not completed any case plan service. Mother readily admitted the same during cross examination. It is evident that Mother has not demonstrated sobriety during the life of this case. Additionally, she is not current on her child support to [WCCS].

{¶ 44} The juvenile court also found Mother had not obtained verifiable employment, income, and suitable housing for her and B.S. The juvenile court's findings were supported by Mother's own testimony. Specifically, as Mother testified, "I have not completed my case plan, no." Therefore, while we acknowledge that the case plan is simply a means to a goal but not the goal itself, Mother's claim that she had adhered to the requirements set forth by her case plan is incorrect and not supported by the record.

{¶ 45} Mother next claims the juvenile court's decision was improper when considering the caseworker's testimony that she exhibited very good natural parental instincts when visiting with B.S. But, as the record indicates, Mother's visitation time never progressed beyond weekly supervised visitation time. In turn, just as the caseworker testified, it is unclear and purely speculative as to "what it would be like when she's not supervised[.]" A child's life is not an experiment that can be left to chance. This is particularly true here when considering Mother has relapsed on multiple occasions prior to,

during, and after giving birth to B.S. This includes Mother's admitted use of methamphetamines the day before giving birth to B.S.

{¶ 46} Mother further claims the juvenile court's decision to grant WCCS's motion for permanent custody was improper when considering she had previously completed an inpatient drug rehabilitation program and, after a relapse, had re-engaged with an outpatient treatment program.[2] In support, Mother calls this court's attention to her testimony indicating she had remained clean and sober in the preceding two months prior to the permanent custody hearing. Therefore, according to Mother, granting WCCS's motion for permanent custody was premature since there was evidence that she had taken positive steps to remedy her substance abuse issues.

{¶ 47} Assuming Mother's claim is true, this court commends Mother for remaining clean and sober in the preceding two months prior to the permanent custody hearing.[3] Positive steps, even when exhibited over just a two-month period, is certainly encouraging. However, "[a] juvenile court 'is not required to deny [a] permanent custody motion simply based upon the groundless speculation that the mother might successfully complete her drug treatment * * * and remain drug-free.'" *In re E.F.*, 12th Dist. Clinton Nos. CA2016-03-003 thru CA2016-03-007, 2016-Ohio-7265, ¶ 36, quoting *In re J.C.*, 4th Dist. Adams No. 07CA834, 2007-Ohio-3783, ¶ 25. This is because, as this court has stated previously, "when dealing with the life of a young child, such as the case here, the juvenile court cannot, and should not, blindly accept one's claims of self-healing without some type of verification." *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 29. Mother's attempts

---

2. It should be noted that Mother did not check herself in to the inpatient treatment facility on her own volition. Instead the court ordered Mother to engage in that program as a condition of her release from jail after she was arrested on a child support warrant.

3. The caseworker testified that WCCS did not drug test Mother in the two months prior to the permanent custody hearing, thereby raising some question as to whether Mother did remain clean and sober during this time.

at finally being able to maintain a clean and sober life in the late stages of these proceedings, although noteworthy, are simply too little too late.

{¶ 48} In so holding, we explicitly reject Mother's claim that the state has taken the position that "any child born of an addicted parent should automatically not be re-united with that parent." The permanency goal in this case – just as it is in all permanent custody proceedings – was to provide Mother with the support she needed through a variety of case plan services in hopes that she would turn her life around and be reunified with B.S. The case plan established in this case explicitly stated that reunification of Mother and B.S. was the permanency goal; specifically, as the case plan stated, the permanency goal for Mother and B.S. was to "[r]eturn the child(ren) to parent/guardian/or custodian (Reunification)."

{¶ 49} Although initially engaging in substance abuse and mental health treatment at an inpatient treatment facility, Mother ultimately failed to successfully complete any of the services provided by WCCS to address her significant substance abuse and untreated mental health issues. Mother also failed to obtain and maintain verifiable employment, income, and housing. Rather than taking responsibility for her own failures, Mother claims WCCS gave up on her. But, as the record indicates, the efforts towards reunification undertaken by WCCS were certainly reasonable. What was unreasonable was Mother's apparent unwillingness or inability to take her recovery seriously both before and after B.S. was removed from her care.

{¶ 50} The fact that Mother's parental rights to B.S. have now been permanently terminated was not the result of some de-facto policy implemented by WCCS as it relates to children born of drug-addicted parents. Far from it. Rather, as the record indicates, Mother's parental rights were permanently terminated because it was in B.S.'s best interest for him to be forever removed from Mother's care and placed in a home that fosters his growth, stability, and security. The juvenile court's decision to grant permanent custody in

this case does just that. Therefore, because B.S.'s best interests are paramount and controlling in all permanent custody proceedings, the juvenile court's decision in this case must be affirmed.

**Conclusion**

{¶ 51} The juvenile court did not err in its decision to grant WCCS's motion for permanent custody. This is because, as discussed more fully above, the juvenile court's decision to grant permanent was supported by sufficient evidence and was not against the manifest weight of the evidence. Mother testified that she loves B.S. with all her heart. Of this we have no doubt. But children are entitled to have stability in their lives by being placed in a legally secured permanent placement. *See In re J.B.*, 12th Dist. Butler No. CA2018-08-175, 2018-Ohio-5049, ¶ 35. Due to the uncertainty regarding Mother's continued sobriety, employment, income, housing, and untreated mental health issues, adoption is the best chance for B.S. to achieve the stable family home that he needs. Therefore, finding no merit to any of the arguments raised herein, Mother's single assignment of error is overruled and the juvenile court's permanent custody determination is affirmed.

{¶ 52} Judgment affirmed.

RINGLAND and M. POWELL, JJ., concur.