[Cite as *In re J.B.*, 2018-Ohio-5049.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| J.B., et al. | : | CASE NO. CA2018-08-175 |
| | : | O P I N I O N<br>12/17/2018 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2015-0293

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, OH 45011, for appellee, Butler County Children Services

Jeannine C. Barbeau, 3268 Jefferson Avenue, Cincinnati, OH 45220, for appellant, Mother

**S. POWELL, P.J.**

{¶ 1}  Appellant, the biological mother of J.B. and I.C. ("Mother"), appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of J.B. and I.C. to appellee, Butler County Children Services ("BCCS"). For the reasons outlined below, we affirm the juvenile court's permanent custody determination.

**The Parties**

{¶ 2}  The two children at issue in this appeal, J.B. and I.C., were born on June 11,

2015 and August 14, 2012. The children were fathered by two different men, thereby making them half-siblings. Neither biological father is a party to this appeal. Mother has since given birth to a third child, G.W. It is undisputed that G.W.'s biological father is currently unknown. It is also undisputed that G.W. has since been placed in the temporary custody of BCCS after he was adjudicated a dependent child. At all times relevant, Mother was married to another man ("Husband") who is reportedly not the biological father of any of Mother's three children, J.B., I.C., or G.W.

**Facts and Procedural History**

{¶ 3} On October 6, 2015, BCCS filed a complaint alleging J.B. was an abused and dependent child. BCCS also filed a complaint alleging I.C. was a dependent child. In support of its complaints, BCCS alleged that it had received a report that Mother and J.B.'s father were involved in a domestic violence incident that took place on July 31, 2015. During this incident, BCCS alleged Mother was holding J.B. and that J.B. was either hit or kicked in the head. I.C. was also present during this domestic violence incident.

{¶ 4} Both Mother and J.B.'s father confirmed the allegations of domestic violence. This included J.B.'s father admitting he had choked Mother during this incident. J.B.'s father also reported to BCCS that Mother "was not taking medication for her mental health and becomes very easily agitated with the children, often neglecting to care for them." The juvenile court granted BCCS emergency temporary custody of both J.B. and I.C. later that day. The children were then removed from Mother's care and a guardian ad litem was appointed for the children.

{¶ 5} On October 12, 2015, BCCS filed amended complaints regarding both J.B. and I.C. The amended complaints included allegations from BCCS that Mother had admitted to being diagnosed as bipolar. Mother also admitted that she had been diagnosed with "depression, panic disorder, PTSD, anxiety disorder, and personality disorder (not

otherwise specified)." The record further indicates Mother had been diagnosed with opiate use disorder and marijuana use disorder. BCCS additionally noted in its amended complaints that Mother had been observed by a caseworker "talking rapidly without taking a breath and becoming easily angered and agitated." Mother thereafter acknowledged that she suffers from poor motor functioning and coordination.

{¶ 6} In addition to these concerns, BCCS alleged in its amended complaints that Mother's home was observed to be in poor condition with dirt, food stains, and dirty clothes cluttering the home. BCCS noted that Mother was advised to clean her home. However, during a follow-up visit, BCCS alleged Mother's home was observed to be even more cluttered than before and that her front door had been "partially kicked in." BCCS also alleged Mother admitted to maintaining her relationship with J.B.'s father despite their previous "reciprocal domestic violence." BCCS further reported that J.B.'s father had admitted that he too had been diagnosed with bipolar disorder and depression "and admitted that his mental health had been untreated until after this investigation commenced."

{¶ 7} As it relates to J.B., BCCS alleged as part of its amended complaints that Mother had taken J.B. to the emergency room on more than one occasion "due to constipation for 5 or more days." BCCS also alleged Mother admitted to feeding J.B. inappropriate food for his age, such as oatmeal and strained peas, and that Mother had been observed feeding J.B. "through a bottle where the hole in the nipple was enlarged, which resulted in [J.B.] choking on the formula." This was particularly concerning to BCCS since J.B. was in just the second percentile for his weight in comparison to other children his age.

{¶ 8} Continuing, BCCS noted as part of the amended complaints that J.B. had since been placed in the care of J.B.'s paternal grandparents. Upon being placed with his

paternal grandparents, the record indicates J.B. was observed to be underweight, dirty, and unkempt. The record indicates J.B. also cried continuously and was oftentimes sick. BCCS noted J.B.'s paternal grandparents had since reported their son, J.B.'s father, "has a history of outbursts and anger issues" that were frightening to J.B.'s paternal grandmother. J.B.'s paternal grandparents later reported to BCCS that they wanted BCCS to gain custody of the children. BCCS concluded by noting that the whereabouts of Husband were then unknown. The record indicates J.B. remained with his paternal grandparents for approximately three weeks before he was placed in a foster home on October 28, 2015.

{¶ 9} On April 7, 2016, the juvenile court held an adjudication hearing for both J.B. and I.C. Following this hearing, the juvenile court adjudicated both of the children as dependent. The juvenile court's decision was based on stipulations from Mother and J.B.'s father that the children were dependent. In reaching this decision, the juvenile court noted that BCCS had previously withdrawn its amended complaint alleging J.B. was an abused child.

{¶ 10} After adjudicating J.B. and I.C. dependent children, the juvenile court adopted a case plan for Mother. The case plan required Mother to attended classes regarding child nutrition and skills involving household maintenance. The case plan also noted that Mother had been referred for a domestic violence assessment and that she was to attend domestic violence counseling. The case plan further required Mother to continue her treatment for her mental health issues. Specifically, the case plan noted that Mother "will need to address her emotional and mental health functioning and demonstrate healthy coping skills, emotional stability, and take her medication as prescribed."

{¶ 11} On June 7, 2016, the juvenile court held a disposition hearing. Following this hearing, the juvenile court issued a dispositional decision finding it was in J.B. and I.C.'s best interests to be placed in the temporary custody of BCCS. Approximately two months

later, at the subsequent annual review hearing, the juvenile court determined that I.C.'s father had abandoned I.C. upon finding he had not had any contact with his daughter for more than 90 days. All other orders were continued. This included the juvenile court's previous order granting temporary custody of the children to BCCS. It is undisputed that I.C.'s father thereafter executed a permanent surrender form of his parental rights to his daughter that was submitted to the juvenile court.

{¶ 12} On December 21, 2016, I.C. was moved from her initial foster home into the same foster home as J.B. As noted above, J.B. had been placed in this foster home on October 28, 2015. Prior to being moved into her new foster home, I.C. had been placed in a different foster home for approximately 14 months beginning on October 6, 2015. During her time in her original foster placement, the record indicates I.C. was observed to be very timid around men, including her foster father, and experienced severe night terrors. These night terrors often included I.C. screaming, scratching, thrashing, and pulling at her pull-up diaper. Since I.C. was moved into the same foster home as J.B. it is undisputed that the children have remained in that same foster home with the same foster family ever since. The record indicates that both J.B. and I.C. are now thriving in their current foster placement.

{¶ 13} On December 29, 2016, BCCS moved for permanent custody of both J.B. and I.C. In support of its motion, BCCS argued that neither J.B. nor I.C. could be placed with Mother or their respective fathers within a reasonable period of time. BCCS also argued that the children could otherwise not be placed with either parent when considering it did not appear that either parent could ever provide adequate parental care for their children. BCCS further argued that it was in J.B. and I.C.'s best interest that it be granted permanent custody when taking into account the reasonable probability that the children would be adopted by their foster parents, that an adoptive placement would positively benefit the

children, and that a commitment of permanent custody would facilitate said adoption. BCCS

lastly argued that both J.B. and I.C. require the permanency that an adoptive placement

would provide.

{¶ 14} Ultimately concluding on December 18, 2017, the juvenile court held a three-

day hearing on BCCS's permanent custody motion. This hearing was held before a juvenile

court magistrate. As part of this hearing, the magistrate heard from several witnesses. This

included testimony from Mother, Mother's psychiatrist, the children's foster mother ("Foster

Mother"), as well a caseworker with BCCS. During this hearing, Foster Mother testified

regarding J.B. as follows:

> Q: * * * [J.B] has been in your home for two (2) years now; can
> you describe what it was like when [J.B.] was first placed with
> you?
>
> A:  When [J.B.] first came to us, he was very, very, small.  He
> was falling off the chart in his weight, and so he was finishing
> out weigh-ins every couple days by the time we got him, and he
> had to go back for one (1) additional weigh-in.  And so his color
> was pretty greenish-gray, he didn't have very good coloration.
> He was, you know, no concerns developmentally, he was just
> very, very small, and like I said, falling off the growth chart, so
> that was his beginning time.
>
> Q:  And how about now?
>
> A:  Okay, now he's a chunky monkey, he's a big boy.  He's a lot
> of boy; he's strong, he's built, has a little belly on him.  Not that
> he's overweight, but he is well-fed.  He loves to eat, he loves
> food.  He loves to run and play and jump off of anything that he
> can, chase anybody he can, sits on the dog.  Yes.

{¶ 15} Foster Mother then testified regarding I.C. that she was a "little bit more

standoffish" when first placed into her home.  However, now being in the same foster home

with J.B. for nearly a year, Foster Mother testified as follows:

> And then she did move in, in December, and since then, you
> know, she has been very carefree, easy-going.  She likes to play
> and she likes to do dress-up.  She gets along great with the

- 6 -

other kids.[1]  For a while…When there's big changes she may get cranky, maybe some moody pretending to pout, but other than that she's very carefree.  She giggles, she runs, she plays.

Foster Mother also testified that the children referred to her and her husband as "Mommy and Daddy."  When asked if her and her husband were interested in adopting the children, Foster Mother testified "Yes."

{¶ 16} On February 26, 2018, the juvenile court magistrate issued a detailed 12-page decision granting BCCS's motion for permanent custody.  In support of its decision, the magistrate determined that BCCS provided clear and convincing evidence that granting permanent custody in this case was what was best for both J.B. and I.C.  Specifically, the juvenile court determined that a grant of permanent custody to BCCS "provides these children with the only hope of permanency, that permanency cannot be achieved without a grand of permanent custody to the agency," and that granting BCCS's motion for permanent custody was in J.B. and I.C.'s best interests.

{¶ 17} On March 5, 2018, Mother filed objections to the magistrate's decision. Mother's objections included a claim that the magistrate's decision to grant BCCs's motion for permanent custody was not supported by sufficient credible evidence and was otherwise against the manifest weight of the evidence.  The juvenile court held a hearing on Mother's objections on August 23, 2018.  After holding this hearing, and upon reviewing the entirety of the record, the juvenile court denied Mother's objections to the magistrate's decision. The juvenile court then issued an entry denying Mother's objections, thereby affirming and adopting the magistrate's permanent custody determination.

## Appeal

{¶ 18} Mother now appeals from the juvenile court's decision granting BCCS's

---

1. Foster Mother testified that there were several other children then living with her and her husband in the foster home; namely, their 12-year-old biological daughter, 11-year-old biological son, two adopted sons, both of whom were then 10 years old, and their nine-year-old adopted daughter.

motion for permanent custody. In support of her appeal, Mother argues the juvenile court's decision to grant permanent custody was not supported by sufficient credible evidence and was otherwise against the manifest weight of the evidence. Under these circumstances, this court applies the following standard of review.

**Standard of Review**

{¶ 19} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 20} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley*

*v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

**Two-Part Permanent Custody Test**

{¶ 21} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**12 Months of a Consecutive 22-Month Period**

{¶ 22} As it relates to the second part of the two-part permanent custody test, the juvenile court found both J.B. and I.C. had been in the temporary custody of BCCS for more than 12 months of a consecutive 22-month period as of the date BCCS moved for permanent custody.  Mother does not dispute this finding.

**Best Interests of J.B. and I.C.**

{¶ 23} Turning now to the first part of the two-part permanent custody test, the juvenile court found it was in J.B. and I.C.'s best interests to grant permanent custody to BCCS.  Mother disputes the juvenile court's best interest determination arguing the juvenile court's decision to grant BCCS's motion for permanent custody was not supported by sufficient credible evidence and was otherwise against the manifest weight of the evidence.  We disagree.

{¶ 24} When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors.  *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32.  These factors include, but are not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.  *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22.  The juvenile court may also consider any other factor(s) it deems relevant to the child's best interest.  *In re N.R.S.*, 3d Dist. Crawford Nos.

3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶ 25} Initially, with respect to J.B. and I.C.'s relevant interactions and relationships with those who may significantly impact their lives, the juvenile court found the children had been thriving in their foster placements. This is because, as the juvenile court noted, both J.B. and I.C. had progressed both emotionally and physically since being removed from Mother's care. The juvenile court also noted that J.B. and I.C.'s foster family was meeting their needs, that the children were bonded with their foster family, and that their foster family is interested in adoption.

{¶ 26} On the other hand, the juvenile court noted that I.C.'s father had executed a permanent surrender form as to his parental rights that was submitted to the juvenile court. The juvenile court also noted that J.B.'s father was not seeking reunification with his son. This, according to J.B.'s father's testimony, was due to his own mental health and stability issues. J.B.'s father further noted his interest for his son to be adopted by his foster family.

{¶ 27} Continuing, the juvenile court noted that Mother genuinely cares for J.B. and I.C. and enjoys spending time with her children. The juvenile court also found that there was a clear bond between Mother and her children. The juvenile court further noted that Mother consistently visited with the children during the pendency of this case. Nevertheless, although the record indicates Mother consistently visited her children, the juvenile court noted that her visitation time never progressed further than bi-weekly supervised visits. The record supports the juvenile court's findings.

{¶ 28} Next, regarding J.B. and I.C.'s wishes, the juvenile court noted that it did not conduct an in-camera interview of the children. The guardian ad litem, however, issued a detailed 22-page report and recommendation that recommended granting BCCS's motion

for permanent custody. This recommendation was based, at least in part, on the fact that due to Mother's chronic mental illness that she "is unable to consistently make safe choices for herself and her young and vulnerable children." This was confirmed by Mother's psychiatrist who testified Mother's mental health issues caused her to experience "impulsivity, chaotic, unstable interpersonal relationships, emotional reactivity, [and] irritability."

{¶ 29} As it relates to J.B. and I.C.'s custodial history, as noted above, the juvenile court found the children had been in the temporary custody of BCCS for over 12 months of a consecutive 22-month period. Mother does not dispute this finding.

{¶ 30} Furthermore, when considering J.B. and I.C.'s need for a legally secure placement, the juvenile court found that although she had exhibited some improvement, Mother had yet to advance to the point where she could have unsupervised visits with the children. This was due, in part, to Mother's inability to appropriately redirect the children when necessary. The juvenile court also noted that Mother "struggles with decision-making if [G.W.] cries or needs attention at the same time as [I.C.] and [J.B.]" This includes an incident where Mother was not closely supervising J.B. during which time J.B. "managed to coil a wire around his neck." The record indicates J.B. was also climbing on the dresser during this incident.

{¶ 31} The juvenile court then noted its concerns regarding Mother's lack of employment and a driver's license, as well as her continued mental health issues and "history of violent relationships" both before and after BCCS became involved in this case. Although lengthy, we find relevant the juvenile court's findings regarding Mother's various relationships with numerous men. As the juvenile court found:

> Mother's history of violent relationships was a concern at the start of this case and it has been a concern while this case has been pending. Mother's violent relationships with [J.B.'s father] and with [I.C.'s father] were two of the reasons these cases were

filed. At the time of the filing, Mother and [J.B.'s father] were still in a relationship. Following their separation, Mother moved in with [J.M.]. [J.M.] had been convicted of child abuse against his daughter. During their relationship, [J.M.] was involved in an incident in which he held a gun to the head of a friend who was visiting. The incident took place in the apartment in Hamilton Mother and the children shared with [J.M.] The Hamilton Police made [J.M.] leave the residence. Mother had been engaged to [J.M.] prior to the gun incident.

After the relationship with [J.M.] ended in November 2016, Mother began a relationship with [D.M.] Mother and [D.M.] got engaged in February 2017. They separated sometime later, although Mother continued to wear an engagement ring until June 2017. The separation happened after [BCCS] asked [D.M.] to do a background check. Mother testified that [D.M.'s] mother and his sister are still in her life.

Around the time that Mother was between relationships with [J.M.] and [D.M.], Mother had what she described as a "two week fling" with [J.Mo.]. The timing of this "fling" corresponds with the date of conception of Mother's youngest child, [G.W.]. However, Mother testified that she did not inform [J.Mo.] of the pregnancy.

Continuing, the juvenile court found:

Mother has a neighbor whose name is Josh (last name not provided). This person was observed in Mother's residence in his boxer shorts, with his laundry in the washer, at the time [BCCS] appeared at Mother's residence to take custody of [G.W.] Mother had left [G.W.] in Josh's care while she went to the store. On an earlier occasion, Josh had left his cell phone in Mother's apartment; on another occasion, Josh was observed taking pictures of Mother and the children outside of the apartment during a supervised visitation. Josh did not submit to a background check.

Throughout this case, Mother has been married to [Husband]. They were married sometime in 2013. Mother testified that [I.C.] was a year old at the time of her marriage to [Husband]. Mother's relationship with [Husband] began after Mother and [I.C.'s father] separated. According to Mother's testimony, she and [Husband] married after they had been together for three months. After Mother and [Husband] separated, Mother began her relationship with [L.B.'s father].[2]

Concluding, the juvenile court found:

2. Although admittedly still married, Mother testified that she had not seen Husband in over a year.

> In the two and a half years since this case was opened in October 2015, Mother has been involved in relationships with at least four other males while still being married to [Husband], who she married between her relationships with the fathers of her children. Mother's total number of relationships since the birth of [I.C.] in 2012 is seven. Mother's relationship with [I.C.'s father] was violent. Mother's relationship with [L.B.'s father] was violent. Mother's relationship with [J.M.] involved his violence against someone else in the home he shared with Mother. Neither [D.M.], nor Josh (last name not provided), would participate in a background check by [BCCS] to determine their need for services in the event of the children's reunification with Mother.

> Mother testified that she is not now in a relationship. However, Mother also testified that in the event the children are returned to her, she would maintain a relationship with Josh.

{¶ 32} The juvenile court then noted its additional concerns regarding Mother's income, noting that her only source of income was from Supplemental Security Income ("SSI") in the amount of $735 per month. The record indicates Mother also received $192 in food stamps. Such concerns were heightened by the fact that Mother, who has not had any employment for nearly a decade, testified her monthly rent and utilities amounted to $635 per month – an amount that is just $100 less than her SSI benefits.[3] The juvenile court also noted its concerns regarding Mother's eligibility to remain on SSI given the uncertainty of Mother's diagnosis as bipolar – the basis for her SSI eligibility. This was based on the testimony of Mother's psychiatrist who, as noted by the juvenile court, opined that "such a diagnosis was not appropriate at this time. A loss of SSI income would affect Mother's monthly budget in a substantial way."

{¶ 33} The juvenile court next found that while it might be theoretically possible for Mother to "address her long standing issues with her mental health and stability in her

---

3. Although the juvenile court found Mother's utilities were $100 a month, Mother testified that she had been late in her payments, which increased her monthly utility bill to $168 a month. Mother also testified that her utilities were not in her name since she owed an additional $800 in unpaid utility bills. Specifically, as Mother testified when asked why her utilities were not in her name, "Because I don't have enough money to pay off my own bill at this time."

personal relationships, as well as parenting, and income stability," based on Mother's history and current living situation, "it is unlikely that Mother will be able to provide a safe and stable environment for these children in the foreseeable future." This, according to the juvenile court, was particularly concerning since J.B. and I.C. had been out of Mother's care for nearly two and one-half years. Therefore, as the juvenile court found, "[w]hile Mother has participated in case plan services, and continues to participate in mental health services, Mother has not reached a level where she can have even unsupervised visitation time with the children at this time." The record indicates this was because there were concerns regarding Mother's parenting skills and her ability to manage her children.

{¶ 34} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court found none of the factors applied to this case.

**Analysis**

{¶ 35} After a thorough review of the record, we find the record fully supports the juvenile court's decision to grant BCCS's motion for permanent custody. Mother nevertheless argues the juvenile court erred by granting permanent custody to BCCS since she was not given the opportunity to demonstrate she could adequately and safely provide for J.B. and I.C. Mother, however, was given ample opportunity to prove that she could adequately and safely provide for her children during the two and one-half years after J.B. and I.C. were removed from her care. Yet, even when given such a lengthy time to turn her life around, Mother had not advanced to the point where she could have even unsupervised visitation time with the children. J.B. and I.C. are entitled to have stability in their lives by being placed in a legally secured permanent placement. The children simply cannot wait idly by while Mother continues to place herself in oftentimes violent personal relationships with various men and otherwise remains stagnant in her recovery from her mental health

issues.[4]  Mother's claim otherwise lacks merit.

{¶ 36} Mother also argues the juvenile court's decision to grant BCCS's motion for permanent custody was improper when considering her loving bond with J.B. and I.C.  This court does not dispute that Mother has such a bond with her children.  However, as this court has repeatedly stated, this is but one factor to be considered when determining the best interest of a child in a permanent custody proceeding.  *See, e.g., In re S.M.*, 12th Dist. Warren No. CA2018-07-076, 2018-Ohio-4654, ¶ 25 (strong bond between mother and child is but one factor to be considered when determining the best interest of a child); *In re A.T.-D.*, 12th Dist. Butler Nos. CA2015-03-059, CA2015-03-060, and CA2015-04-068, 2015-Ohio-2579, ¶ 30 (clear bond between father, grandmother, and child is but one factor to consider when determining the best interest of a child); *In re S.H.*, 12th Dist. Butler Nos. CA2014-12-259 and CA2015-01-008, 2015-Ohio-1763, ¶ 24 (strong bond between mother, grandmother, and child is but one factor to consider when determining best interest of a child); *In re I.B.*, 12th Dist. Butler No. CA2014-12-244, 2015-Ohio-1344, ¶ 20 (strong bond between mother and child is but one factor to consider when determining the best interest of a child).  This is because "there is not one element that is given greater weight than the others."  *In re D.R.*, 12th Dist. Butler No. CA2009-01-018, 2009-Ohio-2805, ¶ 14, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.  Mother's claim otherwise lacks merit.

{¶ 37} Mother further argues the juvenile court's decision to grant BCCS's motion for permanent custody was improper when considering her housing, income, and ability to provide for and meet the needs of J.B. and I.C.  However, contrary to Mother's claims, the record indicates Mother's housing and financial situation are insufficient to properly take

___

4. It should be noted, although the record indicates mother has exhibited some improvement, when asked if she was still struggling with "symptoms like anxiety and racing thoughts and trouble sleeping," Mother testified "Yes."

care of herself let alone three young children. This, as the record indicates, is based primarily on the fact that Mother has not had any employment for nearly a decade and subsists only on SSI benefits and food stamps. The concerns regarding Mother's housing and financial situation are exacerbated by the fact that, just as the juvenile court noted, Mother may not be eligible to receive these benefits give her psychiatrist testimony that Mother's diagnosis as bipolar "was not appropriate at this time." The children's best interests cannot be met under these uncertain and unstable circumstances.

{¶ 38} Regardless, even if Mother's claims regarding her housing, income, and the ability to properly care for J.B. and I.C. were true, simply because Mother may have the ability to provide for her children does not necessarily mean it would be in their best interest to be placed in her care. The juvenile court, just like this court on appeal, must act in a manner that places J.B. and I.C.'s best interests above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2012-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant permanent custody to BCCS in this case does just that. This is because, as the juvenile court found, "it is unlikely that Mother will be able to provide a safe and stable environment for these children in the foreseeable future."

{¶ 39} Mother finally argues the juvenile court's decision to grant BCCS's motion for permanent custody was improper when considering she had completed many of her case plan services. However, while it is certainly a relevant factor to consider whether Mother completed her case plan services, it is well-established that "the case plan is 'simply a means to a goal, but not the goal itself.'" *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 30, quoting *In re C.C.*, 187 Ohio App. 3d 365, 2010-Ohio-780, ¶ 25 (8th

Dist.). "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. Therefore, contrary to Mother's claim, when the focus is on J.B. and I.C.'s best interests, the juvenile court's decision to grant permanent custody of her children to BCCS was supported by sufficient credible evidence and was otherwise not against the manifest weight of the evidence.

**Conclusion**

{¶ 40} The juvenile court did not err in its decision to grant BCCS's motion for permanent custody of J.B. and I.C. In so holding, we note that Mother testified at the hearing on BCCS's motion for permanent custody that the children should be returned to her care since "all kids should be with their mother." Mother also testified that J.B. and I.C. should be returned to her care "[b]ecause I'm Mommy. * * * And you can't replace Mommy." But, as this court has stated previously, "[w]hile 'blood relationship' and 'family unity' are factors to consider when determining a child's best interest, neither one is controlling." *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 12. Therefore, because the children are now thriving in a stable and secure environment, we agree with the juvenile court's decision to grant permanent custody in this case. Accordingly, finding no merit to any of her arguments raised herein, Mother's single assignment of error is overruled, and the juvenile court's permanent custody determination is affirmed.

{¶ 41} Judgment affirmed.

RINGLAND and HENDRICKSON, JJ., concur.