[Cite as *In re G.W.*, 2019-Ohio-1586.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NO. CA2019-01-003 |
| G.W. | : | O P I N I O N<br>4/29/2019 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JV2017-0248

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, OH 45011, for appellee

Jeannine C. Barbeau, P.O. Box 42324, Cincinnati, Ohio 45242, for appellant

Tracy A. Washington, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, guardian ad litem

**M. POWELL, J.**

{¶ 1} Appellant, the mother of G.W. ("Mother"), appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her son to appellee, Butler County Children Services ("BCCS"). For the reasons outlined below, we affirm the juvenile court's permanent custody determination.

**The Parties**

{¶ 2} The child at issue, G.W., was born on July 29, 2017. G.W. has two older siblings, J.B. and I.C. All three children share the same mother. J.B. and I.C. were fathered

by two different men. Although three potential fathers were identified, paternity for G.W. has not been established.

## Complaint, Adjudication, and Disposition

{¶ 3} On August 11, 2017, two weeks after G.W.'s birth, BCCS filed a complaint requesting the juvenile court grant it emergency temporary custody of G.W. The complaint was based on allegations that G.W. was a dependent child. In support of its complaint, BCCS alleged that G.W. was diagnosed at birth with absent corpus callosum, partial absent cavum septum, and enlargement of masa intermedia with unilateral ventriculomegaly.[1] These conditions subject G.W. to the potential of "having seizures, vision impairment, low muscle tone, low percent of pain, delayed toilet training, and a disconnect between the right and left side of his brain." These conditions also require G.W. to attend numerous medical appointments.

{¶ 4} The complaint indicates BCCS had then pending permanent custody proceedings regarding both of G.W.'s older siblings, J.B. and I.C.[2] The complaint also notes that Mother had only ever been provided with supervised visitation time with each of her three children and that Mother had previously been required to complete a number of case plan services in hopes of being reunified with J.B. and I.C. These services included "anger management classes" and other parenting, mental health, and substance abuse treatment from "DLS, TLC, Pressly Ridge, Early Head Start, and the Nest Adult Mentor Program." The complaint concludes by noting BCCS' "ongoing concern about [Mother's] mental health and she is not taking her medication as recommended."

{¶ 5} Upon receiving BCCS's complaint, the juvenile court granted BCCS's request

---

1. The record indicates G.W.'s medical conditions generally consist of a partial or complete absence of an area of the brain that connects the brain's two cerebral hemispheres.

2. The juvenile court ultimately granted permanent custody of J.B. and I.C. to BCCS. We affirmed that award of permanent custody in *In re J.B.*, 12th Dist. Butler No. CA2018-08-175, 2018-Ohio-5049.

for emergency temporary custody of G.W. The juvenile court also appointed G.W. with a guardian ad litem. After BCCS was granted emergency temporary custody, G.W. was removed from Mother's care and placed in a foster home. The foster home where G.W. was placed was the same foster home where his two older siblings, J.B. and I.C., were placed following their removal from Mother's care

{¶ 6} On October 24, 2017, the juvenile court adjudicated G.W. a dependent child. That same day the juvenile court also issued a dispositional decision granting temporary custody of G.W. to BCCS. A case plan for Mother was then adopted by the juvenile court. Similar to the case plan established in the cases involving J.B. and I.C., the case plan in this case also required Mother to seek treatment for her significant mental health and substance abuse issues. This included a requirement that Mother seek treatment to address her emotional and mental health functioning, to demonstrate healthy coping skills, emotional stability, and to take her medication as prescribed. The case plan also required Mother to obtain safe and stable housing, as well as verifiable income and employment.

**Motion for Permanent Custody and Permanent Custody Hearing**

{¶ 7} On March 30, 2018, BCCS moved for permanent custody of G.W. In support of its motion, BCCS alleged G.W. could not be placed with Mother within a reasonable time and should not be placed with Mother "in that it does not appear that [Mother] can ever provide adequate parental care for said child." The juvenile court held a hearing on BCCS's motion on August 7, 2018. The hearing was held before a juvenile court magistrate. The following is a summary of the testimony and evidence presented at that hearing.

<u>Former Caseworker's Testimony</u>

{¶ 8} A former caseworker with BCCS initially testified. This caseworker testified that although she is no longer employed by BCCS, she had been assigned to the cases involving all three of Mother's children, J.B., I.C., and G.W. As it relates to the cases

involving J.B. and I.C., the caseworker testified those two cases were opened due to concerns that J.B. was "not being fed properly." The caseworker also testified that there were concerns regarding "some reciprocal domestic violence in the home, [Mother] having some mental health issues, as well as the home being unclean." But, although provided with case plan services, the caseworker testified that none of the concerns that led to the case being opened for G.W. were alleviated at the time she left BCCS for other employment.

Current Caseworker's Testimony

{¶ 9} The current caseworker assigned to G.W.'s case then testified. This caseworker testified that she had met with Mother just once after being assigned the case. During this meeting, Mother told the caseworker that she was looking to get an apartment and securing some form of employment. Mother, however, did not mention to the caseworker what plans she had going forward on how she planned to provide G.W. with the basic necessities such as diapers, baby wipes, and food.

{¶ 10} The caseworker also testified that while Mother had contacted her therapist to re-engage in mental health services, Mother had yet to do so. The caseworker testified this was because, as Mother stated, "she just didn't want to be around… I think the verbiage she used was 'crazy people.'" But, although not wanting to receive services at that provider due to the presence of so-called "crazy people," the caseworker testified Mother never asked to be referred to a different therapist at a different facility to continue her treatment.

{¶ 11} After discussing her interactions with Mother, the caseworker testified about her meeting with G.W. The caseworker testified that she met G.W. at the foster home where he was placed with his two older siblings, J.B. and I.C. During this visit, the caseworker testified G.W. "seemed like a typical toddler," "a typical happy little boy," who was bonded to his foster family.

{¶ 12} On the other hand, as it relates to Mother, the caseworker testified that Mother

needed to engage in many more case plan services in order to be reunified with G.W. As the caseworker testified:

> I mean, I feel like at this point the most pressing issues would be housing, employment, the ability to meet hers and [G.W.'s] needs on a consistent basis, and I think… also feel that it would be very important for her to re-engage in mental health services, including, you know, her prescribed medications.

These required mental health services, as the caseworker testified, would also include services for her significant substance abuse issues.

### Visitation Supervisor's Testimony

{¶ 13} The next witness to testify was a visitation supervisor assigned to "observe [Mother's] parenting skills and see if she can attend to her children's needs appropriately." The supervisor began her assignment approximately one month after G.W.'s removal from Mother's care. According to this supervisor, although initially "pretty good," Mother's attendance at her supervised visitation time had been less frequent as time went on. This included a period of 54 days between May 30, 2018 to July 23, 2018 where Mother did not attend any of the scheduled supervised visitation times with G.W. Mother told the supervisor she missed these visits because she was "either sick" or because "she was going to a job interview."

{¶ 14} But, when Mother did attend her supervised visitation time, the visitation supervisor testified that Mother did "pretty well." Specifically, the supervisor testified:

> She parented her children pretty well. I didn't really have many concerns. She was really good about using a structured routine. She did have a little bit of issues with enforcing discipline equally for all the kids but, you know, we had talks about it and she would try her best to… try her best to correct herself.

{¶ 15} The visitation supervisor also testified she "never really had issues with [Mother's] parenting skills." The supervisor further testified that G.W. was "happy" when visiting with Mother, "[h]e's never fussy, never really… he doesn't really cry at all when he's

with her." Mother, however, did on occasion not bring the necessary supplies for G.W. during her supervised visitation time. This includes Mother not having any formula, diapers, or baby wipes. The supervisor testified that Mother explained this away by claiming she had either lost her debit card "or she just didn't have the funds at the time."

{¶ 16} Mother's financial issues also impacted her ability to obtain stable and suitable housing. As the visitation supervisor testified when asked about Mother's housing:

> She said that she had rekindled, like, a relationship with one of her exes and that he was helping her pay for her bills and expenses that she couldn't afford, and he ended up breaking up with her and then taking pretty much everything that he was helping her… help supporting her with, so she couldn't pay for anything else.

Explaining further, the supervisor testified:

> I had noticed that she was, like, she was getting furniture and she had the cable, and she told me that she got these things because of [her job], that she was getting income from that job. But then once she started cancelling the visits [with G.W.] and then she wasn't meeting with [G.W.] at all, she finally… we had a conversation over the phone and she finally just broke down and told me what the real situation was, that it was this man who was helping her with her other bills, that's why she was getting furniture and the cable and other, you know, other… just getting the other stuff in the house.

The men that Mother relied upon for financial assistance and housing were oftentimes abusive and those relationships frequently resulted in incidents of domestic violence.

{¶ 17} Concluding, when asked how long she thought it would take Mother to "get to a level" where she could take care of herself and G.W., the visitation supervisor testified "[i]t would take a while. I mean, she doesn't… she doesn't even have a place right now."

### Mother's Testimony

{¶ 18} Mother was the final witness to testify. Mother testified she was currently living with a friend but was looking to move into an apartment. Yet, even if Mother was to find an apartment, the record indicates Mother's housing had been suspect in the past. For

instance, Mother testified her last apartment "had a heroin dealer across the hallway and then a bunch of weed smokers down on the second floor." Mother's ability to find suitable housing was also limited due to her having an unpaid and outstanding $800 utility bill. But, despite this unpaid utility bill, Mother testified she avoided making payments to the utility company by having several of her male companions put the utilities in their names.

{¶ 19} Mother further testified in regard to her income. This, according to Mother, amounts to a combined $905 per month in SSI benefits and food stamps. Mother, however, testified she was "still trying" to obtain employment in order to supplement her fixed monthly income. This included selling "body wraps" from her apartment, should she have one. As for her job search, Mother testified that she "put in applications online and in place" but that she shortly thereafter got sick for "over a month period." Mother admitted that she had not had a "regular job" for nearly a decade.

{¶ 20} Next, when asked why she had not consistently attended her supervised visitation time with G.W., Mother testified she had "been getting sick off and on, and I really wasn't trying to have [G.W.] around it if not necessary[.]" Mother, however, acknowledged that she "waited forever to go to a doctor and never really got a doctor's note saying that I was sick, which was my fault[.]" But, even though she eventually went to the doctor, Mother could not specifically identify her diagnosed illness. Mother instead testified, "I don't remember at this time. I think it was the flu." Mother also testified that she was diagnosed with bronchitis and that "it was bad."

{¶ 21} Continuing, when asked why she did not have the necessary supplies for G.W. during her supervised visitation time, Mother testified:

> This last couple of times it's because I lost my debit card. I had managed to misplace it, I guess, while I was sick, or threw it away in a bag, one of the two, I don't remember which, because I'm bad at not using stuff that has pockets and that kind of purse. But lesson definitely learned this time. And then the other

incident, I think it was just because I had ran out and didn't have… didn't get food stamps and didn't have time to get anymore.

{¶ 22} Mother also testified that she had missed both of G.W.'s medical appointments during the pendency of this case. Mother, however, blamed her absence at G.W.'s first appointment on the driver who was sent to pick her up. Specifically, as Mother testified, the driver was "screwing it up" because "for some reason they didn't have my address right, they missed (sic.) up the numbers." On the other hand, as it relates to G.W.'s second appointment, Mother testified she missed that appointment because she "had the dates mixed up."

{¶ 23} In addition, when asked why she had not yet re-engaged in services to treat her mental health issues, Mother testified that her anxiety was "too high," "really, really high." Mother also testified that she had not yet re-engaged in mental health services because she does not have a "high tolerance" to "deal with stupid people." As Mother testified:

> I know it sounds like a really big judgment statement, but people at [the facility] can get really irritating. Like when you tell them no for a cigarette, they bug you twenty thousand times.

Although previously unwilling to do so, Mother nonetheless testified that she was now willing to re-engage in those services to address her significant mental health and substance abuse issues. Mother also testified that she was now willing to take her medicine as prescribed.

{¶ 24} Concluding, when asked how long it would take for her to move into an apartment, get the utilities put in her name, and re-engage in mental health services, Mother testified she "could probably do it in three (3) months." This is because, according to Mother, the only "real struggle would be the electric, and I'm starting to use my resources a lot more than I was." Mother therefore testified that it was not in G.W.'s best interest to

grant BCCS's motion for permanent custody because G.W. "deserves to be with his mother just like [J.B. and I.C.]. I may make mistakes, but that doesn't mean I don't deserve to have my kids."

## Juvenile Court's Decision

{¶ 25} On August 18, 2018, the juvenile court magistrate issued a decision granting BCCS's motion for permanent custody. In so holding, the magistrate noted Mother's history of placing herself in abusive relationships with numerous men, her untreated mental health and substance abuse issues, and lack of stable housing, income, and employment. Mother objected to the magistrate's decision. But, after reviewing the entire record, the transcript of the proceedings, case file, and the evidence presented, the juvenile court overruled Mother's objections and affirmed and adopted the magistrate's decision in its entirety.

## Appeal

{¶ 26} Mother now appeals the juvenile court's decision, raising a single assignment of error for review. In support of her lone assignment of error, Mother argues the juvenile court's decision finding it was in G.W.'s best interest to grant permanent custody to BCCS was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

### Permanent Custody Standard of Review

{¶ 27} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*,

12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 28} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

### Two-Part Permanent Custody Test

{¶ 29} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate a parent's parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.,* 12th Dist. Butler No. CA2013-

12-248, 2014-Ohio-2580, ¶ 9.  First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D).  *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions.  *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10.  Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test.  *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**Reasonable Time to Place G.W. with Mother**

{¶ 30} As it relates to the second part of the two-part permanent custody test, the juvenile court found G.W could not be placed with Mother within a reasonable time.  Mother disputes this finding by noting that G.W. had not been in the temporary custody of BCCS for a period of at least 12 months of a consecutive 22-month period.[3]  That may very well be true.  But, as noted above, only one of the findings under R.C. 2151.414(B)(1)(a) to (e) must be met to satisfy the second prong of the two-part permanent custody test.  *Id.*

{¶ 31} Moreover, pursuant to R.C. 2151.414(E)(11), the juvenile court was required

---

3. We note that Mother argues the juvenile court "incorrectly found that G.W. had been in the temporary custody of the Agency for twelve (12) months of a consecutive twenty-two (22) month period."  The juvenile made no such finding.  The juvenile court instead found G.W. *had not* been in the temporary custody of BCCS for a period of at least 12 months of a consecutive 22-month period.  The record supports the juvenile court's finding.

- 11 -

to find G.W. could not be placed with Mother within a reasonable time if Mother (1) has had her parental rights involuntarily terminated with respect to any one of G.W.'s siblings and (2) failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, that she could provide a legally secure permanent placement and adequate care for the health, welfare, and safety of G.W.

{¶ 32} Such is the case here for the record firmly establishes that Mother had her parental rights to G.W.'s two older siblings, I.C. and J.B., involuntarily terminated by the juvenile court during the pendency of this case. The record also firmly establishes, and Mother does not dispute, that she could not then provide G.W. with a legally secure permanent placement nor adequate care for G.W.'s health, welfare, and safety. Mother acknowledged these shortcomings within her brief by noting she had "struggled during this case" and still needed at least "a few months to become ready for reunification with G.W." Therefore, based on the facts and circumstances of this case, and due to the plain language found in R.C. 2151.414(E)(11), we find no error in the juvenile court's decision as it relates to the second part of the two-part permanent custody test.

**Best Interest of the Child**

{¶ 33} Turning now to the first part of the two-part permanent custody test, the juvenile court found it was in G.W.'s best interest to grant permanent custody to BCCS. Mother disputes this finding by arguing the juvenile court's best interest determination was not supported by sufficient evidence and was against the manifest weight of the evidence. But, just as with the juvenile court's decision as it relates to the second part of the two-part permanent custody test discussed above, we likewise find no error in the juvenile court's decision as it relates addressing G.W.'s best interest.

<u>Best Interest Standard</u>

{¶ 34} When considering the best interest of a child in a permanent custody case,

the juvenile court is required to consider certain enumerated factors under R.C. 2151.414(D)(1). *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24, citing *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

### Juvenile Court's Best Interest Findings

{¶ 35} Initially, with respect to G.W.'s relevant interactions and relationships with those who may significantly impact his young life, the juvenile court found Mother was the only parent who had visited G.W. after he was placed in the temporary custody of BCCS. Mother was granted supervised visitation time with G.W. During those supervised visits, the juvenile court found Mother "acts in an appropriate and loving manner." Mother's visits, however, had been "inconsistent and she stopped seeing [G.W.] for a period of time during the months of May, June, and July" 2018.

{¶ 36} On the other hand, as it relates to G.W.'s foster placement, the juvenile court

- 13 -

noted that G.W. had been placed in the same foster home with his two older siblings, J.B. and I.C. The juvenile court also noted that G.W. was doing "notably well" in his foster home "developmentally, emotionally, educationally, and physically." The juvenile court further noted that G.W. was bonded with his foster family.

{¶ 37} Next, regarding G.W.'s wishes, the juvenile court relied on the guardian ad litem's report and recommendation that permanent custody of G.W. should be granted to BCCS. As part of the report, the guardian ad litem stated:

> Since [G.W.] was born, [Mother] has not demonstrated stability in her behaviors, or consistently visited with [G.W.], or consistently attended his medical appointments. [G.W.] should be placed into the permanent custody of [BCCS] and remain in the foster home he is currently placed in with his siblings.

That Mother did not attend either of G.W.'s medical appointments is significant given G.W.'s serious medical condition that requires him be given special attention and attend numerous medical appointments.

{¶ 38} Moreover, as it relates to G.W.'s custodial history, the juvenile court found G.W. had lived with Mother for approximately two weeks following his birth. However, due to G.W.'s serious medical issues, as well as Mother's "history with her other children and her mental health condition," G.W. was removed from Mother's care. G.W. has resided in the same foster home with the same foster family ever since. G.W.'s two older siblings, J.B. and I.C., have also be placed in that same foster home. Mother does not dispute these findings.

{¶ 39} Furthermore, when considering G.W.'s need for a legally secure placement, the juvenile court found Mother was then "living with a friend and admits that she is not in a position to take [G.W.] into her care at this time." The juvenile court also found Mother has had a "history of placing herself at risk due to the choices she makes in terms of her relationships with men." This includes Mother tending to "rely upon the men with whom she

is involved for financial support."  The juvenile court further found Mother "has chosen abusive partners in the past and appears to be drawn to seek such men for relationships."

{¶ 40} Continuing with this factor, the juvenile court found Mother has a history of mental health issues.  This includes being diagnosed as having bipolar disorder, post-traumatic stress disorder, anxiety and panic disorder, as well as a personality disorder.[4] Due to her significant mental health issues, Mother was to participate regularly in mental health treatment "which includes psychotherapy groups and medication."  This treatment was also intended to address Mother's substance abuse issues.  Mother, however, was not involved in either mental health or substance abuse treatment.  But, as the juvenile court found, Mother testified she "backed away from going to re-start her treatment because she was experiencing high anxiety and she did not want to deal with stupid people (other patients)."  (Parentheses sic.)

{¶ 41} The juvenile court also noted that Mother has a history of making poor financial decisions.  Specifically, as the juvenile court found:

> [Mother] has limited income but chooses to spend almost her entire income (when she has a residence) on housing.  This leaves her with almost nothing to spend on utilities (she owes local utility bills of about $800.00), clothing, food, and other necessities.  She has only been employed once, by at-home employer, over the last several years.

(Parentheses sic.)

{¶ 42} The juvenile court then again noted that Mother was then living with a friend. But, immediately preceding moving in with her friend, the juvenile court noted that Mother was living in a three-bedroom apartment.  The juvenile court found this apartment was "far too large for Mother's immediate needs."  The juvenile court also found Mother's former

---

4. A psychological evaluation submitted to the juvenile court indicates Mother's diagnosis of post-traumatic stress disorder and the unspecified personality disorder may have resulted from sexual abuse as a child and more recent incidents of domestic violence.

apartment was "subsidized in part by [her former paramour.] When she ended her relationship with [him], she lost her residence."

{¶ 43} Concluding with this factor, the juvenile court noted that, although unlikely, it was nevertheless "remotely possible" that Mother could provide G.W. with a legally secure permanent placement "at some indefinite point in time" in the future. Specifically, as the juvenile court found:

> Mother admits that, at present, she is not in a position to take custody of [G.W.]. She avers that within three months she can secure appropriate housing, have utilities connected, re-initiate mental health treatment, and find employment. Once that occurs, she avers that she will be ready to have visits with [G.W.] in her home. Looking at mother's history, however, that time frame is far too optimistic.

Based upon the foregoing, the juvenile court found the only way that G.W. could be provided with "a legally secure permanent home at this time is through a grant of permanent custody as requested by BCCS."

{¶ 44} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court reiterated its findings under R.C. 2151.414(E)(11) that Mother's parental rights to G.W.'s two siblings, J.B. and I.C., were involuntarily terminated by the juvenile court during the pendency of this case.

### Best Interest Analysis

{¶ 45} Considering the testimony and evidence presented, which also includes a report indicating Mother twice tested positive for marijuana during the pendency of this case, we find the record fully supports the juvenile court's decision finding it was in G.W.'s best interest to grant permanent custody to BCCS. But, as noted above, Mother disputes this finding by arguing the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. We find no merit to Mother's claims.

{¶ 46} Mother initially argues the juvenile court's decision to grant permanent

custody was improper since she "participated in case plan services" and "sought to comply" with the requirements of her case plan. However, while it is certainly a relevant factor to consider whether Mother completed her case plan services, it is well-established that "the case plan is 'simply a means to a goal, but not the goal itself.'" *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 30, quoting *In re C.C.*, 187 Ohio App. 3d 365, 2010-Ohio-780, ¶ 25 (8th Dist.). "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has *substantially remedied* the concerns that caused the child's removal from the parent's custody." (Emphasis sic.) *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24.

{¶ 47} Mother did not remedy the concerns that led to G.W.'s removal from her care, let alone substantially remedy those concerns. Mother in fact failed to take even the slightest steps towards remedying many, if not all, of those concerns. We find this particularly concerning when considering Mother's significant mental health and substance abuse issues went largely untreated throughout the pendency of this case. Concerns regarding Mother's mental health was one of the main issues that led to G.W.'s removal. Therefore, when the focus is on G.W.'s best interests, rather than on Mother's alleged participation in case plan services, the juvenile court's decision to grant permanent custody to BCCS was proper. Mother's claim otherwise lacks merit.

{¶ 48} Mother also argues the juvenile court's decision to grant permanent custody was improper since she "has a bond and loves her son." This court does not dispute that Mother has such a loving bond with G.W. However, as this court has repeatedly stated, this is but one factor to be considered when determining the best interest of a child in a permanent custody proceeding. *See, e.g., In re S.M.*, 12th Dist. Warren No. CA2018-07-076, 2018-Ohio-4654, ¶ 25 (strong bond between mother and child is but one factor to be considered when determining the best interest of a child); *In re A.T.-D.*, 12th Dist. Butler

Nos. CA2015-03-059, CA2015-03-060, and CA2015-04-068, 2015-Ohio-2579, ¶ 30 (clear bond between father, grandmother, and child is but one factor to consider when determining the best interest of a child); *In re S.H.*, 12th Dist. Butler Nos. CA2014-12-259 and CA2015-01-008, 2015-Ohio-1763, ¶ 24 (strong bond between mother, grandmother, and child is but one factor to consider when determining best interest of a child); *In re I.B.*, 12th Dist. Butler No. CA2014-12-244, 2015-Ohio-1344, ¶ 20 (strong bond between mother and child is but one factor to consider when determining the best interest of a child).

{¶ 49} We reiterated this same principle when affirming the juvenile court's decision granting BCCS's motion for permanent custody of G.W.'s two older siblings, J.B. and I.C. *See In re J.B.*, 2018-Ohio-5049 at ¶ 36. "[T]here is not one element that is given greater weight than the others." *In re D.R.*, 12th Dist. Butler No. CA2009-01-018, 2009-Ohio-2805, ¶ 14, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. While the record confirms that there is a loving bond between Mother and G.W., the record also demonstrates that G.W. is bonded to his foster family. This is significant when considering J.B. and I.C. are also placed in the same foster home with the same foster family as G.W. Therefore, just as we did in affirming the juvenile court's decision regarding J.B. and I.C., we find Mother's claim that the juvenile court erred by granting BCCS's motion for permanent custody simply because she has a loving bond with G.W. lacks merit.

{¶ 50} Mother next argues the juvenile court's decision granting permanent custody was improper because the juvenile court incorrectly found that granting BCCS's motion for permanent custody was the only way G.W. could be placed in a legally secure permanent placement. Mother supports her argument by citing to the juvenile court's decision finding that, although unlikely, it might be "remotely possible" that she could provide G.W. with a legally secure permanent placement "at some indefinite point in time" in the future. Therefore, based on this singular statement contained in the juvenile court's decision,

Mother argues the juvenile court's decision should be reversed to allow her "a few months to become ready for reunification with G.W." We disagree.

{¶ 51} Despite Mother's claims, the record indicates Mother was given ample opportunity to prove she could adequately and safely provide for G.W. in the many months after he was removed from her care. Yet, even when given several months to take steps towards turning her life around, Mother did not successfully complete most, if not all, of her case plan services. This includes the requirement that Mother obtain safe and stable housing, as well as verifiable income and employment. Mother also did not re-engage in the required mental health services so as to properly address her significant mental health and substance abuse issues. Mother, having already lost custody of J.B. and I.C., apparently did not appreciate the fact that she could also lose custody of G.W. The blame for Mother having now lost custody to all three of her children cannot be attributed to anything other than Mother's own conduct before, during, and after her children were removed from her care. Mother's claim otherwise lacks merit.

{¶ 52} Notwithstanding the juvenile court's finding it might be "remotely possible" that Mother could provide G.W. with a legally secure permanent placement "at some indefinite point in time," placing G.W. back into an environment where he may not receive the attention he needs to remain both physically and developmentally on track would not be in G.W.'s best interest. Simply stated, Mother's claim that she would be on track for reunification with G.W. within just three short months requires this court to not only speculate on Mother's sincerity but to gamble with G.W.'s life. A child's life is not an experiment that can be left to chance. That is, stated differently, "'[t]he law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" (Internal brackets omitted.) *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2,

2015-Ohio-4245, ¶ 53.

{¶ 53} Just as this court found in regard to J.B. and I.C., G.W. too cannot wait idly by while Mother continues to place herself in oftentimes violent personal relationships with various men and otherwise remains stagnant in her recovery from her significant mental health and substance abuse issues. Unfortunately, due to Mother's limited progress in addressing the concerns that led to G.W.'s removal from her care, providing Mother with "a little time" at this point in the proceedings would do nothing more than prolong the inevitable. A parent "'is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal.'" *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32, quoting *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50. Mother, given a reasonable time to do so, has failed to remedy the conditions that led to G.W.'s removal in this case. Mother's claims that she is now ready to take steps towards reunification with G.W. is simply too little, too late. Mother's claims to the contrary lack merit.

## Conclusion

{¶ 54} The juvenile court did not err in its decision to grant BCCS's motion for permanent custody. The juvenile court, just like this court, must act in a manner that places G.W.'s best interest above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision does just that. That is to say the juvenile court's decision to grant BCCS's motion for permanent custody is in G.W.'s best interest as it gives him the best opportunity to grow and develop into a well-rounded adult.

{¶ 55} In so holding, we note Mother's testimony that G.W. "deserves to be with his

mother just like [J.B. and I.C.]. I may make mistakes, but that doesn't mean I don't deserve to have my kids." We all make mistakes, true. But the mistakes that Mother has made – and continues to make – do not just impact her own life. Mother's mistakes significantly impact G.W.'s ability in grow up a safe and stable environment that fosters both his mental and physical development. The same is true regarding Mother's two other children, J.B. and I.C. Therefore, because the juvenile court's decision granting BCCS's motion for permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence, Mother's single assignment of error lacks merit and is overruled.

{¶ 56} Judgment affirmed.

RINGLAND, P.J., and PIPER, J., concur.