[Cite as *In re M.G.*, 2023-Ohio-1316.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| | | CASE NO. CA2022-11-010 |
| M.G., et al. | : | |
| | | O P I N I O N |
| | : | 4/24/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2021-3034; 2021-3035; 2021-3036; 2021-3037

The Law Office of Karen Oakley, LLC, and Karen Oakley, for appellant.

Zac Corbin, Brown County Prosecuting Attorney, and Courtney A. Worley, Assistant Prosecuting Attorney, for appellee.

**S. POWELL, P.J.**

{¶1} Appellant ("Father") appeals the decision of the Brown County Court of

Common Pleas, Juvenile Division, granting permanent custody of his four children, M.G.,

S.G., D.G., and A.G., to appellee, Brown County Department of Job and Family Services ("BCDJFS"). For the reasons outlined below, we affirm the juvenile court's decision.

## The Parties

{¶2}    This case involves the permanent custody of the four above-named children. The children, one girl and three boys, were born on August 13, 2015, February 21, 2017, June 29, 2019, and October 6, 2020, respectively. There is no dispute that Father, who lives in South Carolina, is the biological father of all four children. There is also no dispute that the children's mother ("Mother"), who is not a party to this appeal, consented to having her parental rights to the children terminated by the juvenile court. This is in addition to Mother giving her consent for the juvenile court to award permanent custody of the children to BCDJFS.

## Facts and Procedural History

{¶3}    On April 22, 2021, a complaint was filed by BCDJFS alleging the children were abused, neglected, and dependent.[1]  BCDJFS filed this complaint after having already engaged Mother in a voluntary safety plan following A.G.'s birth approximately six months earlier, on October 6, 2020. To support its abuse, neglect, and dependence complaint, BCDJFS alleged, among other things, that Mother had tested positive for THC at the time of A.G.'s birth and that Mother had admitted to smoking THC on a regular basis.[2]  BCDJFS also alleged that both Mother and the children's maternal grandparents had disclosed that Father had been "abusive and controlling" towards Mother during Mother and Father's on-again-off-again relationship.

---

1. We note that although all four children were given different case numbers, for ease of discussion, and because the filings are substantially similar in each of the four cases, we will refer to the record as if all four children were filed under the same case number throughout this opinion.

2. The abbreviation THC is short for Tetrahydrocannabinol. Tetrahydrocannabinol is the active ingredient and main psychoactive compound found in marijuana. *State v. Graves*, 5th Dist. Ashland No. 22 COA 001, 2022-Ohio-4130, ¶ 5.

{¶4} On April 23, 2021, the juvenile court held an emergency shelter care hearing. Following this hearing, the juvenile court issued an interim order granting temporary custody of the children to BCDJFS. The juvenile court also appointed Mother and Father with their own, separate counsel and the children with a guardian ad litem. The record indicates that Mother personally appeared at the emergency shelter care hearing, whereas Father appeared at that hearing via telephone from his home in South Carolina.

{¶5} On May 12, 2021, the juvenile court held an adjudicatory hearing where it adjudicated all four children as abused, neglected, and dependent. The juvenile court also approved a case plan for Mother. This case plan required Mother to address her substance abuse and mental health issues. The case plan also required Mother to complete parenting classes. Father, who the record indicates did not challenge the juvenile court's decision to adjudicate the children as abused, neglected, and dependent in any way, appeared at this hearing with counsel. Mother's counsel also appeared at this hearing. Mother, however, did not.

{¶6} On June 16, 2021, the juvenile court held a disposition hearing where it issued a dispositional decision granting temporary custody of the children to BCDJFS. Both Mother and Father, neither of whom the record indicates objected to the juvenile court's dispositional decision, appeared at this hearing with their respective counsel.

{¶7} On January 5, 2022, the juvenile court approved a case plan for Father. This case plan required Father to obtain a mental health assessment and to complete parenting classes. The case plan also required Father to attend an anger management/domestic violence education course. This was in addition to the case plan requiring Father to physically appear in Ohio twice a month for supervised visitation time with the children. This requirement, which the record indicates Father himself approved, was included in the case plan so that Father could develop an otherwise non-existent bond between himself and the

- 3 -

children.

{¶8} On July 22, 2022, BCDJFS filed a motion for permanent custody. To support its permanent custody motion, BCDJFS alleged that Father had not maintained consistent contact with the agency and that Father did not "inquire about his children's well-being" or engage in the required services set forth in his case plan. BCDJFS also alleged that Father had not engaged in the necessary anger management/domestic violence education course and that Father was no longer attending the required parenting classes after he was "discharged due to a lack of compliance and participation." BCDJFS further alleged that although Father had received an approved home study from his home state of South Carolina pursuant to the Interstate Compact on the Placement of Children ("ICPC"), Father had nevertheless "failed to establish any sort of consistent relationship with the children" given his limited contact with the children since their placement in BCDJFS' temporary custody over a year earlier, on April 23, 2021.

{¶9} BCDJFS supported this allegation by noting that Father had only attended three of the last 15 supervised visits he was to have with the children, the most recent taking place over five months earlier, on February 15, 2022. BCDJFS also noted that during the limited visitation time Father spent with the children, A.G. "cries excessively and is inconsolable" and D.G. "plays independently." BCDJFS further noted that during Father's visitation time S.G. "has requested to leave the visitation, pulling on the door, requesting his Case Worker." This is in addition to BCDJFS noting that Father "has been observed to be overwhelmed" when visiting with the children and that Father had "ended a visit prematurely in 2021 because [A.G.] was inconsolable." BCDJFS alleged that this was in stark contrast to how the children behaved in their respective foster homes where they were "doing extremely well in the care of their foster families and receiving services that contribute to their development."

*Hearing on BCDJFS' Motion for Permanent Custody*

**{¶10}** On the morning of September 21, 2022, the juvenile court held a hearing on BCDJFS' motion for permanent custody. Mother, Mother's counsel, Father's counsel, the caseworker then assigned to the children's case, and the children's guardian ad litem all appeared at this hearing. Father, however, did not. The following is a summary of the relevant proceedings taking place at that permanent custody hearing.[3] This includes an overview of the testimony offered by the two witnesses who testified at this hearing: the children's caseworker and the children's guardian ad litem.[4]

**{¶11}** Upon opening the hearing, the juvenile court recognized that Father was not present within the courtroom. The juvenile court then asked Father's counsel, Attorney Vivian Martin, if she knew Father's whereabouts that morning. Attorney Martin responded, "No, Your Honor." Attorney Martin then advised the juvenile court that it was her understanding that Father had been properly served with notice of when and where the hearing on BCDJFS' permanent custody motion was to take place. Attorney Martin also advised the juvenile court that she and Father had been communicating back-and-forth via email the preceding week, but that Father had not responded to her last email asking whether he would be attending that morning's hearing. Attorney Martin further advised the juvenile court that she had attempted to call Father earlier that morning, but that she was unable to reach Father at either of his last two known telephone numbers.

**{¶12}** Following this exchange, Attorney Martin then advised the juvenile court that because Father had "missed the last couple or so of court hearings," that she was moving to withdraw as Father's counsel. After a brief discussion with BCDJFS' counsel, the juvenile

---

3. The transcript of the hearing on BCDJFS' motion for permanent custody spans a total of just 33 pages.

4. During oral argument, father claimed that only the children's caseworker testified. The record does not support this claim. Both the children's caseworker and guardian ad litem testified at the hearing on BCDJFS' permanent custody motion.

court denied Attorney Martin's motion to withdraw. In so doing, the juvenile court stated:

> Counsel, your client has left you in a position. I've been there many times, a position where there – there's not a lot you can do for him at this point if he doesn't feel the need to come to court.
>
> I am going to deny your motion though, just because it – the nature of the evidence is going to be presented briefly this morning is going to be about him, and I don't frankly want to give a – an issue for appeal purposes that you were not present.

{¶13} The juvenile court also stated:

> And I thank you for – I thank you for your motion. It was appropriate. I just, for making that record clear that there have been the attempts to get ahold of him. He's been served. You've tried to get him. It will – it will allow us to go forward and sometimes we're just doing it as a – we're – we're here for the – for the information. But there's not a lot of things you can do without him, but I appreciate you staying.

{¶14} Shortly after the juvenile court denied her motion to withdraw, Attorney Martin then moved the juvenile court to continue the hearing on BCDJFS' motion for permanent custody to a later date given Father's absence. The juvenile court denied this motion as well stating:

> I'm going to deny it just in the fact that I think you've made diligent efforts to get in touch with him. We have proper service. And we cannot continue to kick this can down the road given [Father's] flightiness at a minimum and a lack of predictability of whether he's going to be here or not.

The juvenile court did note, however, that it would have given more consideration to Attorney Martin's motion to continue had Father appeared for all of the court's prior review hearings, "[b]ut the failure to come to those when he was properly served puts us in a position here where I think it's in the best interest of all, including the – most importantly the children to go forward."

{¶15} Moving on, BCDJFS then called the children's caseworker to the stand to testify. Upon taking the stand, the caseworker testified that despite having received an

approved ICPC home study for Father's home in South Carolina, BCDJFS still had significant concerns regarding Father's "bond with the children and their relationship with one another." Explaining why that was, the caseworker testified that Father had limited involvement with the children over the previous two years and that the last time Father had seen the children in person was approximately seven months earlier, on February 15, 2022. The caseworker also testified that although BCDJFS had offered Father nearly 20 different opportunities to visit with the children, Father had only attended five of those visits, "and two of those were virtual." The caseworker then testified:

> [Father's] first contact with the agency would have been face-to-face. It would have been June 16th of 2021. And that was his first visit with the children since the agency's involvement. That also would have been his first visit with [A.G.], which is the youngest child. So, that child would have been 7 months old by the time he had met that child initially.

{¶16} Continuing, the caseworker testified:

> So then, visits were offered and tried to be set up with the previous caseworker. Another visit was offered in August [of 2021]. He did not attend that. * * * The ICPC was completed when I became the caseworker for the case in November. * * * I had reached out to him and we set up a virtual visit in December. And then he came to his first visit in January [of 2022] when we had a court hearing. Him and I met together. He was added to the case plan per the ICPC being approved. And then visitations were set up twice a month for the remainder of – until now, and the virtual visits were also offered in between until those weren't going well.

The caseworker did testify, however, that Father had seemingly established a bond with the two oldest children, M.G. and S.G., while Mother and the children were living with Father in South Carolina. The caseworker testified that such a bond existed even though S.G. "doesn't necessarily always know" that Father is, in fact, his father.

{¶17} The caseworker was then asked about the three in-person supervised visits Father had with the children. The caseworker testified that those three visits "were not

successful." Explaining why that was, the caseworker testified that Father had ended the first visit "partially early with [A.G.] because [A.G.] was crying excessively." The caseworker then testified regarding the two other in-person visits Father had with the children as follows:

> The other couple of visits that I supervised myself, because that was prior to me being the caseworker, but the other in-person visitations that I had supervised myself, [Father was] more engaged. [Father] engaged more with the older two children. [D.G.] was very disengaged, and [A.G.] would cry excessively. One of those visits [A.G.] cried for the entirety of the – of the visit, and then at another visit, [S.G.] kept asking to leave the room and asking for his caseworker.

Thereafter, when asked what BCDJFS' position was at it related to Father's bond with the children, the caseworker testified that BCDJFS does not believe there is a bond between the children and Father.

{¶18} The caseworker was then asked about what services BCDJFS had offered to Father as part of his case plan. The caseworker testified that one of the services offered to Father was case management. The caseworker testified that this included diligently keeping Father "in the loop" about when and where he could visit with the children. The caseworker testified that she did this by emailing and/or telephoning Father prior to each visit, "typically either the day before or the morning of, and within that email would also let him know when the other scheduled visits were." The caseworker testified that Father responded to her emails only occasionally to tell her "if he was coming or not" and that sometimes "it would be a day or so later" before she would get any response from Father.

{¶19} The caseworker then testified regarding her last contact with Father as follows:

> I completed a zoom with him, because his phone number was not working and I was getting one of those generated calls that

> this is no longer a working number.[5] He emailed me back and we set up a zoom visit. It was on September the 6th. * * * He told me that he had separated from his fiancée who he was living with, and he was no longer living in that home. He would not provide an address to me, and would not provide me with his new cell phone number.

The caseworker testified that Father had actually told her that it was "none of [her] business" where he was living. The caseworker then testified that because Father refused to provide her with his new address that BCDJFS had no way of knowing whether Father had stable housing that would be suitable for the children at that time.

{¶20} The caseworker testified that BCDJFS had also offered parenting education to Father, something which the caseworker testified Father did not complete. As the case worker testified:

> I made a – I actually contacted the South Carolina Children Services equivalent, and they provided me with a facility that they typically use for those type of services. So, I made a referral to – it's called "A Father's Place" in February of 2022. And so, he did begin those services but he did not complete and he was discharged from the program on June 14, 2022 due to his lack of participation and involvement. And they had reached out to him via email, phone, and mail.

The caseworker testified that BCDJFS had also required Father to receive a mental health assessment and to attend anger management/domestic violence classes, neither of which the caseworker testified Father had ever even started.

{¶21} The caseworker then testified regarding the children and their bond with their respective foster families. Specifically, as it relates to the two older children, M.G. and S.G., the case worker testified that both children were then in counseling and that:

> [S.G.] had some behavioral issues when he first came. He also was doing some bedwetting and stuff as well when he was first

---

5. Zoom is a cloud-based technology platform used for live, two-way video conferencing. Zoom was utilized by a variety of different entities during the height of the COVID-19 pandemic to facilitate remote work, meetings, and other proceedings. This includes the majority of oral arguments conducted before this court during 2020 and 2021. Zoom is available on computers through a download on the Zoom website or on mobile devices through the installation of a free application.

placed. Since then, he has been doing very well. He has started kindergarten.

[M.G.] did go into first grade. They were concerned with her academics at the beginning, but she did some summer school. But now that she's into the first grade, they do think that an IEP is going to be necessary in order to help her, you know, continue.

**{¶22}** The caseworker then testified that the two younger children, D.G. and A.G., were "doing very well, and they are excelling." Testifying further, the caseworker stated:

[D.G.], when he was first brought into the agency, they believed that he was deaf. After an evaluation it was determined by Children's [Hospital], it was determined he was not deaf. * * * He is delayed at the moment, but he has been – they've been receiving Help Me Grow services and some intervention.[6] [D.G.] was just recently evaluated by the school psychologist, because he was turning 3. So, he's aging out of Help Me Grow. So, he was evaluated and he's going to be receiving speech and occupational therapy that's due to his developmental delays.

And with [A.G.], currently he's not showing any developmental delays, but there are future concerns because he was positive for THC as a baby.

**{¶23}** Concluding, the caseworker testified that the children's needs were being met by their respective foster families and that BCDJFS did not have any concerns about whether the children's needs would continue to be met by their foster families in the future. The caseworker therefore testified that she believed granting permanent custody of the children to BCDJFS was in the children's best interest. Father's counsel, Attorney Martin, then rose for cross-examination and asked the caseworker the following three questions:

Q: You stated that the agency was involved since October of 2020? Is that right?

A: Yes, ma'am.

Q: Okay. Did – was the removal on April 23rd of '21 though?

---

6. Help Me Grow is a voluntary program that provides assistance with, and information about, development, parenting, and family support.

A: Yes.

Q: Okay. So, your involvement prior to that date in April was on a voluntary safety plan, right?

A: Yes.

Q: Okay. That's all I have, Your Honor.

The juvenile court then excused the caseworker as a witness.[7]

{¶24} The children's guardian ad litem, the only other witness to testify, was then called to the stand. The guardian ad litem testified that she believed "that permanent custody would be best for the children" because they "definitely need some stability in their life." The guardian ad litem also testified that she believed placing the children with Father was "not appropriate" for the children at that time. Father's counsel, Attorney Martin, did not ask the guardian ad litem any questions. Following one question from Mother's counsel, the state then rested. The juvenile court then addressed Mother and confirmed with Mother that she was knowingly, intelligently, and voluntarily forfeiting her parental rights to the children. The juvenile court also confirmed with Mother that she agreed that it was in the children's best interest for BCDJFS to be awarded permanent custody of the children.

*The Juvenile Court's Decision Granting BCDJFS' Motion for Permanent Custody*

{¶25} Following this brief exchange with Mother, the juvenile court noted that it would be issuing a short decision setting forth its decision to grant permanent custody of the children to BCDJFS. In so doing, the juvenile court stated:

> I am going to [grant BCDJFS permanent custody of the children]. I am going to make an oral indication of that now. And it – my entry today will reflect that I have – there is – the evidence presented has not been – has not been really challenged in any significant way given Father's not being here

---

7. Father also claimed during oral argument that his counsel, Attorney Martin, did not ask the caseworker any questions during the hearing on BCDJFS' motion for permanent custody. As can be seen, the record does not support this claim.

- 11 -

today and availing himself to the Court. The case plan services that have been offered have not been completed. The failure to have any significant contact not only with his children but with his counsel is indicative of the overall problem in this case.

{¶26} The juvenile court also stated:

There's been some connection that there was a bond with some of the older children and not so much with the younger children (inaudible) given the time of the agency, it's (sic) involvement, and the length of time the case has been opened, which can be expected. However, there ha[ve] been ample opportunities through the services offered to try to give availability and the ability to have contact. He failed to fulfill that.

{¶27} This was in addition to the juvenile court stating:

I find it most telling that we've had to do an interstate compact in this case (inaudible) to request that we get information and we can work with the father. But then at the conclusion of his times, his positioning is I have a new address and I'm not going to tell you what it is. That in essence prevents any type of true evaluation of his perspective or in his position, and his ability to care for the children. And it – and then fundamentally basically ends my evaluation of this case at that point. * * * So, my ruling today will be very minimal in its terminology. I will later supplement my findings of fact, conclusions of law – findings of facts and conclusions of law to complete the entry in its entirety.

{¶28} The hearing on BCDJFS' motion for permanent custody was then concluded and the matter was taken off the record. Shortly thereafter, the juvenile court issued a one-page judgment entry noting its decision to grant permanent custody of the children to BCDJFS. The juvenile court also noted within its entry that Father had been properly served with BCDJFS' permanent custody motion and that "the caseworker had contact with Father via Zoom on September 6, 2022 and he indicated he was going to appear for today's hearing." The juvenile court further noted that Father's counsel, Attorney Martin, had moved to withdraw as Father's counsel due to Father's failure to appear, but that the motion had been denied "due to the nature of this hearing." The juvenile court noted that the same was true as it related to Attorney Martin's motion to continue.

*The Juvenile Court's Findings of Fact and Conclusions of Law*

{¶29} On October 19, 2022, the juvenile court issued a nine-page entry setting forth its findings of fact and conclusions of law supporting its earlier permanent custody decision. The juvenile court stated within this entry its finding the children had been in the temporary custody of BCDJFS since the emergency shelter care hearing held on April 23, 2021, well over 12 months of a consecutive 22-month period. The juvenile court also stated within this entry its finding neither Mother nor Father had remedied any of the issues that had caused the children's removal from their care, "thus the children were prevented from going home." The juvenile court found this to be the case even though BCDJFS had made reasonable efforts to eliminate the children's continued removal from their parents' care. The juvenile court further stated within this entry its finding the children were in need of a legally secure permanent placement, something which the juvenile court found "only can be derived from a grant of permanent custody to BCDJFS."

{¶30} The juvenile court then set forth two additional considerations that it found significant to its permanent custody decision. The first being Mother's consent to have her parental rights to the children terminated and agreement that permanent custody of the children should be awarded to BCDJFS. The second being Father's failure to appear at the permanent custody hearing despite Father having notice of when and where the hearing on BCDJFS' permanent custody motion was to take place. Specifically, as the juvenile court stated:

> Also, determinative in the Court's ruling was Father's failure to attend the permanent custody hearing. On the record, the Court inquired to his attorney, court staff and BCDJFS representative to verify proper service and attempted personal contact with Father. Upon questioning all present, the Court finds [Father] was legally served and was personally aware of the hearing. Consistent with other hearings that Father did not attend. His counsel, Vivian Martin, requested to be released from case prior to the hearing. In an attempt to preserve his rights, her request

- 13 -

was denied. Counsel for Father was present during the hearing and engaged in advocating for him.

The juvenile court then concluded its entry by noting its finding the children's best interests would be served by granting permanent custody to BCDJFS.

**Father's Appeal and Four Assignments of Error for Review**

{¶31} On November 14, 2022, Father filed a notice of appeal from the juvenile court's decision granting permanent custody of the children to BCDJFS. Oral argument was held before this court on April 3, 2023. Father's appeal now properly before this court for decision, Father has raised four assignments of error for review. For ease of discussion, we will address Father's four assignments of error out of order.

**Assignment of Error No. 2:**

{¶32} THE COURT ERRED IN ALLOWING HEARSAY TESTIMONY IN DETERMINING WHETHER TO TERMINATE THE APPELLANT'S PARENTAL RIGHTS.

{¶33} In his second assignment of error, Father argues the juvenile court erred and, in fact, committed plain error, by allowing otherwise inadmissible hearsay testimony into evidence at the hearing on BCDJFS' motion for permanent custody. We disagree.

*Admission or Exclusion of Evidence and Plain Error Standard*

{¶34} Generally, this court will not reverse a lower court's decision regarding the admission of evidence absent an abuse of discretion. *In re A.S.*, 183 Ohio App.3d 697, 2009-Ohio-3932, ¶ 53 (12th Dist.). This holds true even in permanent custody cases. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 23. Father, however, did not object to any of the testimony for which he now complains. By failing to object, Father has waived all but plain error on appeal. *In re B.J. & L.J.*, 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 61. A finding of plain error is strictly limited, extremely rare, and occurs only in exceptional circumstances. *In re*

*A.D.*, 12th Dist. Clermont No. CA2021-11-060, 2022-Ohio-736, ¶ 17, citing *In re T.J.*, 12th Dist. Preble No. CA2008-10-019, 2009-Ohio-1844, ¶ 34; *In re J.W.*, 12th Dist. Butler Nos. CA2017-12-183 and CA2017-12-184, 2018-Ohio-1781, ¶ 13. This is because the plain error doctrine implicates only those errors "that are 'obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse [e]ffect on the character and public confidence in judicial proceedings.'" *In re J.M.*, 12th Dist. Butler Nos. CA2018-06-124 and CA2018-06-125, 2019-Ohio-3716, ¶ 14, quoting *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982).

*Father's Argument and Analysis*

**{¶35}** Father argues it was plain error for the juvenile court to allow into evidence the caseworker's "entire testimony" about what took place during Father's limited supervised visitation time with the children. Father also argues it was plain error for the juvenile court to allow the caseworker to testify about the bond, or lack thereof, between Father and the children. This is because, according to Father, the caseworker's testimony was "predominately" hearsay that was lacking a proper foundation since it was not the caseworker who supervised any of Father's visitation time with the children.[8] Hearsay is inadmissible in hearings on motions for permanent custody. *In re W.R.*, 12th Dist. Fayette No. CA2011-08-016, 2012-Ohio-382, ¶ 22. "However, it is well-established that as the fact-finder, a juvenile court is presumed to have considered only properly admissible evidence unless the record affirmatively demonstrates otherwise." *In re H.D.*, 12th Dist. Warren No.

---

8. Father claimed during oral argument that there was no evidence the testifying caseworker either supervised or was ever even present during any of Father's visitation time with the children. Once again, the record does not support this claim. The record instead indicates that the caseworker was present and supervised two of the three in-person visits Father had with the children. Specifically, as the case worker testified, "The other couple of visits that I supervised myself, because that was prior to me being the caseworker, but the other in-person visitations that I had supervised myself, [Father was] more engaged." The caseworker testified this was the case even though D.G. was "very disengaged," A.G. would cry "excessively," and S.G. "kept asking to leave the room and asking for his caseworker" during these two visits.

CA2016-11-098, 2017-Ohio-1333, ¶ 8, citing *In re A.F.*, 12th Dist. Butler No. CA2011-12-233, 2012-Ohio-2958, ¶ 33.

{¶36} Father has failed to overcome this presumption. Father has also failed to demonstrate how the admission of such evidence subjected him to any resulting prejudice. *See In re K.B.*, 12th Dist. Butler Nos. CA2014-02-042 thru CA2014-02-044, 2014-Ohio-3654, ¶ 83 ("the admission of hearsay evidence in cases involving the termination of parental rights, even if error, is not considered prejudicial unless it is shown that the judge relied on improper evidence in making his decision"); *see also In re O.H.*, 9th Dist. Summit No. 25761, 2011-Ohio-5632, ¶ 26 ("[w]here an out-of-court statement is erroneously admitted, it must still be evaluated for prejudice"). We find this particularly true here when considering the caseworker's testimony was predominantly, if not wholly, cumulative to the other evidence contained within the record. This includes, among other things, the guardian ad litem's various reports and recommendations submitted to the juvenile court. Therefore, given the record properly before this court, the juvenile court did not err, let alone commit plain error, by allowing the caseworker to testify about what happened during Father's limited supervised visitation time with the children. The same is true as it relates to the caseworker's testimony about the bond, or lack thereof, between Father and the children. Accordingly, finding no merit to any of Father's arguments advanced herein, Father's second assignment of error lacks merit and is overruled.

**Assignment of Error No. 3:**

{¶37} THE COURT ERRED WHEN IT FOUND BCDJFS MADE REASONABLE EFFORTS TO REUNIFY FATHER WITH HIS CHILDREN.

{¶38} In his third assignment of error, Father argues the juvenile court erred by finding BCDJFS had made reasonable efforts to reunify him with the children. We disagree.

*Reasonable Efforts Standard*

- 16 -

{¶39} R.C. 2151.419(A)(1) requires a juvenile court, before it terminates a parent's parental rights, "to determine whether reasonable efforts have been made to reunify the family, which the children services agency has the burden of proving." *In re V.R.R.*, 12th Dist. Butler No. CA2022-08-079, 2023-Ohio-185, ¶ 23. The term "reasonable efforts" has not been statutorily defined by R.C. 2151.419 or by R.C. Chapter 2151 as a whole. *In re A.B.*, 12th Dist. Clermont Nos. CA2022-05-022 and CA2022-05-023, 2022-Ohio-4716, ¶ 17; *In re Colter*, 12th Dist. Madison No. CA89-07-011, 1990 Ohio App. LEXIS 1459, *6 (Apr. 16, 1990). The term "reasonable efforts" has nevertheless been construed by the Ohio Supreme Court to mean "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. This necessarily requires the relevant children services agency to "act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification." *In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 60. That is to say, the applicable children services agency "must use reasonable efforts to help remove the obstacles preventing family reunification." *Id.*

{¶40} What constitutes "reasonable efforts" does not mean all available efforts, however. *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 70. "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.B.*, 12th Dist. Clermont Nos. CA2015-01-011 and CA2015-01-012, 2015-Ohio-2732, ¶ 50. To that end, "[w]hen examining whether a children services agency made reasonable efforts to reunify a family, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 29. Whether a children services agency has

met that standard varies with the circumstances of each individual case. *In re A.B.*, 2022-Ohio-4716 at ¶ 18; *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76. However, although the question of whether the applicable children services agency made reasonable efforts towards reunification varies with the circumstances of each individual case, what does not vary is that the health and safety of the children must remain paramount. *In re E.P.*, 12th Dist. Fayette Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 15, citing R.C. 2151.419(A)(1).

*Father's Argument and Analysis*

{¶41} Father argues the juvenile court erred by finding BCDJFS had made reasonable efforts towards reunification because he was not "offered any services" by BCDJFS and because BCDJFS did not require him "to complete any case plan services" given the approved ICPC home study he received from his home state of South Carolina. However, although we generally agree with Father's assertion that "he can not (sic) complete what he was not offered," the record firmly establishes that BCDJFS offered Father a multitude of services which Father either did not complete or did not engage in at all in the months leading up to the permanent custody hearing. This is evidenced by the case plan approved by the juvenile court for Father on January 5, 2022, which required Father to obtain a mental health assessment and to complete parenting classes and an anger management/domestic violence education course. This case plan also required Father to physically appear and attend parenting time with the children twice a month so that he could develop a bond with the children. The record indicates that Father was well aware of the services BCDJFS included in the case plan and that Father chose, for whatever reason, to either not complete those services or not to engage in those services at all. Therefore, because the record refutes Father's claim that BCDJFS had not offered him any services and had not required him to complete any case plan services given the

approved ICPC home study from his home state of South Carolina, Father's third assignment of error also lacks merit and is overruled.

**Assignment of Error No. 4:**

{¶42} THE COURT'S GRANTING PERMANENT CUSTODY TO BCDJFS IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶43} In his fourth assignment of error, Father argues the juvenile court's decision granting permanent custody of the children to BCDJFS was against the manifest weight of the evidence. Father also argues the juvenile court's decision to grant permanent custody of the children to BCDJFS was not supported by sufficient evidence.[9] We disagree with both of Father's claims.

*Permanent Custody Manifest Weight and Sufficiency of the Evidence Standards*

{¶44} Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 14, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 12th Dist. Butler No. CA2020-07-074, 2020-Ohio-6663, ¶ 13. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight

_____

9. We note that, although Father's fourth assignment of error indicates that he is challenging just the juvenile court's decision as being against the manifest weight of the evidence, Father also alleges within the body of his appellate brief that the juvenile court's decision was not supported by sufficient evidence. This occurs most notably within Father's conclusionary paragraph, wherein Father states that "[t]here is insufficient evidence to terminate [his] parental rights." Therefore, in an abundance of caution, we will analyze the juvenile court's decision granting permanent custody to BCDJFS under both the sufficiency and manifest weight of the evidence standards of review.

of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 2016-Ohio-72 at ¶ 19.

{¶45} In determining whether a juvenile court's decision is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15. "We are especially mindful of this in permanent custody cases." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 26.

*Father's Argument and Analysis*

{¶46} Father argues the juvenile court's decision to grant permanent custody of the children was not supported by sufficient evidence and was against the manifest weight of the evidence because the "evidence presented by BCDJFS [was] inadmissible hearsay" and because he "was not given case plan services." Father also argues the juvenile court's decision to grant permanent custody of the children to BCDJFS was not supported by sufficient evidence and against the manifest weight of the evidence because the children were removed from Mother, not from him, and because he had an ICPC approved home study from his home state of South Carolina. "The decision to terminate a parent's parental rights requires serious consideration and should not be taken lightly." *In re L.H.*, 1st Dist.

Hamilton No. C-220161, 2022-Ohio-2755, ¶ 53. This is because, in Ohio, the permanent termination of one's parental rights is likened to the family-law equivalent of the death penalty. *In re R.K.*, 152 Ohio St.3d 316, 2018-Ohio-23, ¶ 1, citing *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 10; and *In re Hayes*, 79 Ohio St.3d 46, 48 (1997).

**{¶47}** However, after a thorough review of the record, we find the juvenile court's decision to grant permanent custody of the children to BCDJFS was supported by sufficient evidence and not against the manifest weight of the evidence. This is because, as a simple review of the record reveals, the juvenile court's decision to grant permanent custody was supported by the clear and convincing evidence presented at the permanent custody hearing. This includes the testimony from the children's caseworker that Father was not in any way bonded with the children, whereas S.G. was doing "very well" with his foster family, and that the two younger children, D.G. and A.G., were "doing very well, and they are excelling" with their foster families.

**{¶48}** This also includes the caseworker's testimony that the children's needs were being met by their respective foster families and that BCDJFS did not have any concerns about the children's needs being met going forward. This is in addition to the children's guardian ad litem's testimony that the children's best interests would be served by granting permanent custody to BCDJFS because the children "definitely need some stability in their life," which Father could not provide. Therefore, finding no merit to Father's claims alleging the juvenile court's decision to grant BCDJFS permanent custody of the children was not supported by sufficient evidence and was against the manifest weight of the evidence, Father's fourth assignment of error lacks merit and is overruled.

**{¶49}** In so holding, we note Father's argument made during oral argument claiming the juvenile court relied on Father's prior conviction for felony unlawful neglect of a child to grant permanent custody of the children to BCDJFS. This is simply not true as there was

no mention of Father ever being convicted of any crime, let alone felony unlawful neglect of a child, within the juvenile court's permanent custody decision. And, contrary to what both Father and BCDJFS stated during oral argument, there was also no mention of Father's criminal history, if any, at the hearing on BCDJFS' motion for permanent custody. The only references this court could find to Father's purported conviction for felony unlawful neglect of a child was one brief mention in BCDJFS' abuse, neglect, or dependency complaint, a reference that was then repeated within the guardian ad litem's various reports and recommendations submitted to the juvenile court.

{¶50} However, even then, neither BCDJFS nor the guardian ad litem ever alleged that Father had been *convicted* of felony unlawful neglect of a child. Rather, BCDJFS and the guardian ad litem alleged only that Father had been *charged* with that offense. Being *charged* with a crime is vastly different than being *convicted* of a crime because, unlike a charge, "a 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty." (Emphasis sic.) *State v. Whitfield*, 124 Ohio St. 3d 319, 2010-Ohio-2, ¶ 12. Being charged with a crime also carries with it the presumption of innocence. This presumption remains until and unless that person is proven guilty beyond a reasonable doubt by the state. *See* R.C. 2901.05(A) ("[e]very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution"). Therefore, despite Father's claims, the juvenile court did not in any way rely on Father's purported prior conviction for felony unlawful neglect of a child in granting permanent custody to BCDJFS.

**Assignment of Error No. 1:**

{¶51} THE COURT ERRED IN TERMINATING THE APPELLANT'S PARENTAL RIGHTS AS COUNSEL FOR THE APPELLANT WAS INEFFECTIVE.

{¶52} In his first assignment of error, Father argues his trial counsel, Attorney

Martin, provided him with ineffective assistance. This is because, according to Father, Attorney Martin performed "well below" what he considers professionally competent assistance. We disagree.

*Ineffective Assistance of Counsel Standard*

{¶53} "A parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re L.J.*, 12th Dist. Warren No. CA2014-10-124, 2015-Ohio-1567, ¶ 33. This is because parental rights involve a fundamental liberty interest, procedural due process, which includes the right to effective assistance of counsel. *In re C.D.*, 12th Dist. Brown No. CA2009-07-030, 2009-Ohio-6922, ¶ 22. "When determining whether counsel was ineffective in a permanent custody hearing, a reviewing court must apply the two-tier test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984)." *In re G.W.*, 12th Dist. Butler No. CA2013-12-246, 2014-Ohio-2579, ¶ 12. "That is to say, the parent must show that counsel's performance was outside the wide range of professionally competent assistance and that counsel's deficient performance prejudiced the parent." *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047 thru CA2021-08-049, 2022-Ohio-48, ¶ 29, citing *In re C.S.*, 12th Dist. Warren No. CA2018-07-080, 2018-Ohio-4786, ¶ 33. "A strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound trial strategy and falls within the wide range of professional assistance." *In re J.J.*, 12th Dist. Butler No. CA2005-12-525, 2006-Ohio-2999, ¶ 58.

*Father's Four Arguments and Analysis*

{¶54} Father claims that, but for his trial counsel's "poor performance" throughout the underlying proceedings, the juvenile court would have returned the children to him rather than granting permanent custody of the children to BCDJFS. To support this claim, Father raises four arguments for our consideration. We address each of Father's four arguments

in turn.

## Father's First Argument

{¶55} Father initially argues his trial counsel, Attorney Martin, was ineffective for not filing a motion to dismiss BCDJFS' complaint when considering the complaint alleged only "minimal bad conduct" on his part and did not show how he was a danger to the children. However, the time for Father to challenge the allegations set forth within BCDJFS' complaint has long since passed and is now barred by the doctrine of res judicata. *See, e.g., In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 46 ("because [a mother] did not file an appeal from the juvenile court's adjudicatory decision and temporary custody order granting temporary custody of [her two children] to [a county department of job and family services], [the mother was] barred from arguing that her counsel provided her with ineffective assistance of counsel based on counsel's performance at any time prior to when the juvenile court issued its adjudication decision and dispositional order").

{¶56} Moreover, even if not barred by the doctrine of res judicata, Attorney Martin moving to dismiss BCDJFS' complaint by arguing the complaint alleged only "minimal bad conduct" on Father's part and did not show how he was a danger to the children would have been futile given BCDJFS' other allegations set forth within the complaint related to Mother. This includes, but is not limited to, BCDJFS' allegation that Mother had tested positive for THC at the time of A.G.'s birth. This also includes BCDJFS' allegation that Mother had admitted to smoking THC on a regular basis. "An attorney is not ineffective for failing to make a futile or frivolous request." *State v. White*, 12th Dist. Madison Nos. CA2021-05-007 and CA2021-05-008, 2022-Ohio-2182, ¶ 14. This holds true even in permanent custody cases such as this. *See In re C.B.*, 8th Dist. Cuyahoga No. 111456, 2022-Ohio-3136, ¶ 31. Therefore, even if not barred by the doctrine of res judicata, Father's first argument lacks

merit.

Father's Second Argument

**{¶57}** Father also argues Attorney Martin was ineffective for not moving to dismiss the complaint because none of the allegations set forth within the complaint were pled with specificity and because the complaint failed to state how the children were in any way harmed while they were in his care. However, just as with Father's first argument, Father's second, alternative argument is also barred by the doctrine of res judicata. *In re R.D.*, 2021-Ohio-3780 at ¶ 46. But, even if it was not, Attorney Martin moving to dismiss BCDJFS' complaint on this alternative basis would have also been futile. This is because, as the record indicates, the allegations set forth in the complaint were pled with more than enough specificity to overcome any Civ.R. 12(B)(6) motion to dismiss. *See State ex rel. T.P. v. Franklin Cty. Children Services*, 10th Dist. Franklin No. 18AP-163, 2018-Ohio-4129 (noting in an underlying permanent custody case that "it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery" in order for "a court to dismiss a complaint for failure to state a claim upon which relief can be granted" pursuant to Civ.R. 12[B][6]). This includes, as noted above, BCDJFS' claim that Mother had tested positive for THC at the time of A.G.'s birth and that Mother had admitted to smoking THC on a regular basis. Again, even in permanent custody cases, "[c]ounsel cannot be deficient for failing to assert a futile claim." *In re M.C.*, 4th Dist. Scioto No. 16CA3755, 2016-Ohio-8294, ¶ 20. Therefore, even if not barred by the doctrine of res judicata, Father's second argument also lacks merit.

Father's Third Argument

**{¶58}** Father additionally argues Attorney Martin was ineffective for not moving the juvenile court to return the children to him and instead doing "nothing" towards reunification while this case was pending. Father, however, does not provide this court with any

- 25 -

examples of what he believes Attorney Martin should have done differently other than filing a generic motion "to request that his children be placed in his home." But, acting in the best interest of the child, a juvenile court must not act on a whim by simply handing over a child to someone new. This holds true even if that person is the child's biological father. This is because, as this court has stated previously, "[a] child's life is not an experiment that can be left to chance." *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 52. A child's life also is not something the juvenile court should take a gamble on. This holds true no matter how good the odds may seem. *See, e.g. In re K.W.*, 4th Dist. Highland Nos. 17CA7 and 17CA8, 2018-Ohio-1933, ¶ 91 ("[w]hile father stated that he did not believe the child would carry out any threats [of self-harm] and that the child would be fine if placed in his care, a child's life is not a gamble").

**{¶59}** Moreover, despite Father's claims, the law does not now, nor has it ever required a juvenile court to place a child with a parent simply because that parent received an approved ICPC home study from the parent's home state. The law instead requires a juvenile court to gauge each case independently based on the totality of the circumstances and determine what would be in the best interest of the child. *See generally In re W.J.T.*, 12th Dist. Butler No. CA2019-03-047, 2019-Ohio-3051, ¶ 46 ("[t]he juvenile court, just like this court, must act in a manner that places [the child's] best interest above all else"). Given Father's status as the children's biological father, we have no doubt that this is difficult for Father to appreciate. But, determining what should be done with any given child, while also protecting the rights of each parent or other parties involved, is a complicated task for the juvenile court to determine. This is why the General Assembly requires a juvenile court to consider several statutorily enumerated factors before a person's parental rights to their children can be terminated. *See* R.C. 2151.414(D) and 2151.414(E).

**{¶60}** One such factor the General Assembly requires a juvenile court to consider

when determining best interest of a child is "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). Another factor the General Assembly requires a juvenile court to consider when determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent is whether either of the child's parents have availed themselves to the services offered to them by the children services agency overseeing his or her child's case. R.C. 2151.414(E)(1). Father did not do that in this case. Father instead sought—and continues to seek—someone other than himself to place the blame for his parental rights to the children being terminated. Father's attempts to shift blame to someone other than himself, including Attorney Martin, are not persuasive and serve as further support for the juvenile court's decision to grant permanent custody of the children to BCDJFS. Therefore, Father's third argument likewise lacks merit.

### Father's Fourth Argument

{¶61} Father lastly argues Attorney Martin was ineffective for not objecting to "any of the inadmissible testimony" elicited at the permanent custody hearing and for not asking any questions of the children's caseworker or the children's guardian ad litem on cross-examination. However, although we agree that Attorney Martin did not ask any questions of the guardian ad litem, Attorney Martin did ask questions of the caseworker when given the opportunity. Given that Attorney Martin actually did ask questions of the caseworker, Father must necessarily be arguing that Attorney Martin's questioning was inadequate. But, as this court has stated previously, "there are no rules dictating what amount of cross-examination is acceptable; rather, this is largely a tactical decision and a matter of trial strategy." *In re Hodge/Burchett*, 12th Dist. Butler Nos. CA94-08-170, CA94-09-174, CA94-09-186, and CA94-09-187, 1995 Ohio App. LEXIS 3246, *12 (Aug. 7, 1995). This means

that this court, when reviewing an ineffective assistance counsel claim, "must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." *In re C.D.*, 2009-Ohio-6922 at ¶ 23. This is because "[a]ll licensed attorneys are presumed competent and the challenged actions are presumed to reflect sound trial strategy within the range of reasonable professional assistance." *In re L.B.*, 8th Dist. Cuyahoga No. 111766, 2022-Ohio-4748, ¶ 52. Father has not overcome that presumption here. Therefore, Father's fourth argument similarly lacks merit. Accordingly, finding no merit to any of Father's four arguments raised herein, Father's fourth assignment of error alleging he received ineffective assistance of counsel is overruled.

## Conclusion

**{¶62}** For the reasons outlined above, and overruling each of the four assignments of error advanced by Father, the juvenile court's decision granting BCDJFS permanent custody of the four children at issue in this case, M.G., S.G., D.G., and A.G., is affirmed.[10]

**{¶63}** Judgment affirmed.

M. POWELL, and BYRNE, JJ., concur.

---

10. Father attempted to raise several new arguments for this court's consideration during oral argument that were not contained within his appellate brief. Father, however, cannot advance any new arguments during oral argument. *See Simmons v. Budde*, 10th Dist. Franklin No. 14AP-846, 2015-Ohio-3780, ¶ 10; *see also Andreyko v. Cincinnati*, 153 Ohio App.3d 108, 2003-Ohio-2759, ¶ 20 (1st Dist.) ("an issue raised during oral argument for the first time and not assigned as error in an appellate brief is waived"), citing *Watkins v. Dept. of Human Servs.*, 10th Dist. Franklin No. 00AP-224, 2000 Ohio App. LEXIS 5018 (Oct. 31, 2000). Therefore, any new arguments that Father may have raised during oral argument that were not otherwise addressed herein, those arguments have been waived.